**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ariel TERRY–CRESPO, Defendant–Appellant.**

**No. 03–30085.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 2003.

Filed Jan. 29, 2004.

---

55. 8 U.S.C. § 1157(a)(5).

Ruben L. Iñiguez, Assistant Federal Public Defender, Portland, OR, for the defendant-appellant.

Fredric N. Weinhouse, Assistant United States Attorney, Portland, OR, for the plaintiff-appellee.

Before ALARCÓN, RAWLINSON, and BYBEE, Circuit Judges.

BYBEE, Circuit Judge.

Defendant Ariel Terry–Crespo appeals the district court's denial of his motion to suppress physical evidence and statements. He alleges that reasonable suspicion did not support the police's investigatory stop, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that the evidence obtained was the suppressible, poisonous fruit of a search conducted in violation of the Fourth Amendment. The district court found that the 911 telephone call precipitating the stop had sufficient indicia of reliability to provide the

police with reasonable articulable suspicion justifying it. At sentencing, the district court determined that Terry–Crespo's prior Oregon conviction for unlawful use of a firearm constituted a "crime of violence." It then enhanced his offense level and sentenced him to twenty-four months incarceration. He timely appeals both his conviction and sentence.

We agree with the district court that the victim's preliminary 911 call bore sufficient indicia of reliability and that, notwithstanding Terry–Crespo's argument to the contrary, *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), does not compel suppression. First, as a threshold matter, the preliminary 911 call did not constitute an anonymous tip. The informant provided his name and narrowed the likely class of informants by providing identifying information during the recorded 911 call. Second, the 911 call was entitled to greater reliability than a tip concerning general criminality because the police must be able to take seriously, and respond promptly to, emergency 911 calls. Third, the victim jeopardized any anonymity he might have enjoyed by placing his 911 call and risking criminal sanction under Oregon law for any false report. Finally, his 911 call was entitled to greater reliability because it evidenced first-hand information from a victim-informant. Accordingly, we affirm the denial of Terry–Crespo's motion to dismiss.

In addition, we affirm the district court's "crime of violence" enhancement under U.S.S.G. § 2K2.1(a)(4)(A) (2002). Whether or not Terry–Crespo shot at an inhabited building, he created a serious potential risk of physical injury by firing his gun at a building located within Portland's city limits.

## FACTS AND PROCEEDINGS BELOW

On the evening of April 17, 2002, José Domingis called 911 to report that a man had, three minutes earlier, threatened him with a .45 handgun. He described the suspect as a twenty-year old Hispanic male, attired "like a gang member" with a hat, white and blue jersey, brown jacket, and backpack. The threat occurred in the vicinity of the high crime area of Holgate and Milwaukie in Portland.

Mr. Domingis identified himself to the 911 emergency operator. When asked to spell his last name, he spelled it as "Domingis," rather than the more common and expected spelling, "Dominguez." It appears from the transcript and audiotape recording of the call that Mr. Domingis was not a native English-speaker and spoke English with difficulty.

During the course of the 911 call, the operator asked Mr. Domingis for his telephone number. Mr. Domingis explained that he did not know the return number because he was calling from someone else's cellular telephone. When the operator asked if there was another number where she could reach him, he did not answer her question but returned to discussing the subject of the suspect's location. The operator asked Mr. Domingis for his location. Initially, he responded by providing a non-existent intersection on Portland's grid system and then stammeringly told the operator that "I don't want. . . . I don't want. . . . I don't want. . . ." While not certain, it appears that Mr. Domingis did not want police contact.

A police operator immediately dispatched officers to perform an "area check" in the vicinity of Holgate and Milwaukie after Mr. Domingis's call. Shortly afterward, Mr. Domingis placed a second call to another 911 operator. During this second call, Mr. Domingis again identified himself by name. Although Mr. Domingis claimed to be situated almost a mile and a half away from the suspect, he nonetheless confirmed the suspect's location in the

parking lot of the Rose Manor Motel. He then reported contemporaneously as Portland Police Bureau Officer Kulp arrived on the scene within thirty seconds of the dispatch and spotlighted the suspect. Officer Kulp exited his patrol vehicle, drew his firearm, and pointed it at the suspect and told him to put his hands up and not move. When police backup arrived to provide cover, Officer Kulp handcuffed and patted-down the suspect, Terry–Crespo. As Officer Kulp patted him down, a .45 caliber semi-automatic handgun, fully loaded with a round in the chamber, fell from inside his waistband to the ground. The information from this second 911 call was not communicated to Officer Kulp prior to the *Terry* stop.

Following Terry–Crespo's arrest, the Portland police attempted to relocate Mr. Domingis by querying multiple databases, including the Yahoo! Internet search engine. The effort was unsuccessful; no germane or exact match was reported.

The United States charged Terry–Crespo with one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) (2000). Terry–Crespo moved to suppress the handgun as well as other physical evidence and statements, arguing that Mr. Domingis's telephone calls constituted anonymous tips that could not furnish the police with reasonable suspicion to justify the pat-down. The district court denied the motion. Terry–Crespo then conditionally pleaded guilty, but reserved his right to appeal his sentence and the denial of his motion to suppress.

He also challenged the district court's enhancement of his sentence due to a prior "crime of violence" conviction. The indictment for that earlier conviction charged him with unlawful use of a weapon in violation of Oregon law. OR. REV. STAT. § 166.220(1)(b). The district court held that Terry–Crespo's prior conviction constituted a "crime of violence" within the meaning of the United States Sentencing Guideline Manual ("Guidelines") § 4B1.2. Accordingly, the district court enhanced his base offense level to twenty. U.S.S.G. § 2K2.1(a)(4)(A) (2002). After granting Terry–Crespo a three-level reduction for his acceptance of responsibility, the district court sentenced him to twenty-four months imprisonment based upon a total offense level of seventeen and a criminal history category of one.

## STANDARD OF REVIEW

■ We review de novo the district court's denial of the motion to suppress, *United States v. Jones*, 286 F.3d 1146, 1150 (9th Cir.2002), as well as the district court's interpretation of the Guidelines. *United States v. Jones*, 231 F.3d 508, 519 (9th Cir.2000). Factual findings are reviewed for clear error. *Jones*, 286 F.3d at 1150.

## DISCUSSION

### A.  *Motion to Suppress*

■ If Officer Kulp had a reasonable articulable suspicion that Terry–Crespo posed a threat to his safety or the safety of others, he could detain him to conduct an investigatory, "pat down" frisk, consistent with the Fourth Amendment's prohibition against "unreasonable searches and seizures." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Provided Mr. Domingis's 911 call exhibited sufficient "indicia of reliability," it could have provided Officer Kulp with reasonable suspicion justifying a *Terry* stop. *Id.* We consider the totality of the circumstances in determining whether Officer Kulp had a "particularized and objective basis" for suspecting wrongdoing by Terry–Crespo. *United States v. Arvizu*, 534

U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

In *Florida v. J.L.*, 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Supreme Court assessed the reliability of an anonymous tip that a black male minor, standing at a bus stop and wearing a plaid shirt, possessed a firearm in violation of Florida law. *See id.* at 271, 120 S.Ct. 1375. There was no audio recording of the tip or other documentation of the call in the record; nothing was known about the anonymous informant; and the tipster apparently did not place an emergency call to 911, but called the police department. *See id.* at 268, 120 S.Ct. 1375; *id.* at 275, 120 S.Ct. 1375 (Kennedy, J., concurring). The Court held that such an anonymous tip identifying an individual as carrying a gun, without more, did not provide reasonable suspicion justifying a *Terry* stop and frisk. *See id.* at 268, 120 S.Ct. 1375. That tip amounted to no more than a "bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271, 120 S.Ct. 1375.

Here, Officer Kulp admitted that, apart from Mr. Domingis's initial 911 call, he had no reason to suspect Terry–Crespo of illegal conduct that night. Accordingly, Mr. Domingis's 911 call, standing alone, had to provide Officer Kulp with the reasonable articulable suspicion justifying the *Terry* stop. Before the police could rely on this tip from a named 911 caller, however, the tip had to carry sufficient indicia of reliability. Terry–Crespo does not challenge the reliability of the 911 call viewed after the fact. Portland police located him as the identified suspect along with his .45 handgun, as described. That *ex post* inquiry, however, is not our focus. Instead, we inquire whether the first 911 call provided the police with sufficient indicia of

reliability *prior* to the *Terry* stop to justify reliance on it. We conclude that it did.

José Domingis's first 911 call demonstrated sufficient indicia of reliability to support a reasonable suspicion justifying the *Terry* stop. First, as a threshold matter, Mr. Domingis's call was not anonymous and therefore was entitled to greater reliability. Concurring separately in *Florida v. J.L.*, Justice Kennedy elaborated on what constituted anonymity for the purposes of the Court's holding. While "a tip might be anonymous in some sense," it may have "certain other features, either supporting reliability or narrowing the likely class of informants, so that the tip does provide the lawful basis for some police action." *Id.* at 275, 120 S.Ct. 1375 (Kennedy, J., concurring). For example, in *United States v. Fernandez–Castillo*, 324 F.3d 1114 (9th Cir.), *cert. denied,* —— U.S. ——, 124 S.Ct. 418, 157 L.Ed.2d 299 (2003), the Montana Department of Transportation informed the state highway patrol of a tip it had received from one of its employees. Even though the arresting officer neither had the employee's name in advance of the *Terry* stop nor had corroborated any illegal activity prior to the stop, we distinguished the case from *J.L.* and deemed the tipster a known source. *Id.* at 1118. We did not treat the informant as anonymous because the tip narrowed the likely class of informants to Montana Department of Transportation employees.

Here, the recorded and transcribed initial 911 call narrowed the likely class of informants. The caller identified himself to the 911 operator as José Domingis. From the audio recording and transcript of the taped call, it is evident that Mr. Domingis is an adult male, Spanish–English bilingual, whose native language was not English. Terry–Crespo capitalizes on the unusual spelling of Mr. Domingis's last name to suggest that the informant provid-

ed a false name or a pseudonym and, therefore, was for all intents and purposes "anonymous." This claim ignores several plausible explanations for the irregular spelling, including the possibility that it was difficult for Mr. Domingis to communicate the correct spelling of his name in English. After all, Mr. Domingis's English was not facile. At one point during the first call, the 911 operator asked him, "Sir, do you speak English?" In light of Mr. Domingis's provisional English, it is unclear that the unusual orthography ("Domingis," rather than "Dominguez") represented evasion so much as the difficulty a non-native English speaker might encounter in attempting to spell his name in a foreign language under stressful circumstances. In denying the motion to suppress, the district court apparently credited the Government's plausible version of the facts, *i.e.* that the police reasonably believed that Mr. Domingis provided his real name. We conclude that the district court did not clearly err in doing so.

*United States v. Morales,* 252 F.3d 1070 (9th Cir.2001), is not to the contrary. In *Morales,* we held that Montana police officers lacked a reasonable suspicion to stop drug-trafficking suspects where they failed to corroborate a tip passed along to them by Washington State. *See id.* at 1077. The court *assumed* the tip was anonymous because Washington's notice provided no information about the tip's source or the basis for the tipster's information. *See id.* at 1074; *see also United States v. Thomas,* 211 F.3d 1186, 1190 (9th Cir.2000) (treating unattributed information passed along by the FBI as anonymous). Therefore, *Morales* did not articulate what constituted an anonymous versus a non-anonymous tip and does not dictate suppression.

Terry–Crespo suggests that the Government's inability, by database query or otherwise, to relocate Mr. Domingis renders his tip anonymous and that, therefore, the Portland police had to corroborate the anonymous tip before relying on it. We acknowledge that any given caller reporting an emergency to 911 *could* provide a false name. Indeed, there may be circumstances in which the police know, or should know, that a caller has obviously given a false name to enshroud himself with anonymity, for example, a caller self-identifying as "Arnold Schwarzenegger" or "Jon Bon Jovi." This case, however, is not that circumstance. The male caller, who was not a native English speaker and who at one point spoke in Spanish, gave the 911 operator a plausible Hispanic name and spelled it for her. That "Domingis" was not the expected spelling of the homophone "Dominguez" does not diminish the reasonableness of the police reliance on this caller at that time as a known source. We decline to impose a duty on the police to confirm the identity of every 911 caller who provides his or her name or to know the universe of names in the United States and their endless variants. The Fourth Amendment's reasonableness requirement does not demand such linguistic precision.

One further concern with the anonymous tip evident in *J.L.,* not present in this case, was the complete absence of any evidence of the call. In *J.L.,* the Court emphasized that the record was devoid of *any* documentation or audio recording of the tip whatsoever. *J.L.,* 529 U.S. at 268, 120 S.Ct. 1375. Absent evidence of the original call, the specter of after-the-fact, police fabrication of an "anonymous informant" would challenge any Fourth Amendment analysis. In contrast, the Portland police recorded both of Mr. Domingis's 911 calls and provided the court with a recording and transcription. Therefore, we do not believe that the same concerns that may have animated the Court to treat *J.L.* as an unreliable, anonymous tip apply here.

Second, Mr. Domingis's 911 call prior to the *Terry* stop was entitled to greater reliability than a tip concerning general criminality because the police must take 911 emergency calls seriously and respond with dispatch. In *United States v. Holloway*, 290 F.3d 1331 (11th Cir.2002), *cert. denied*, 537 U.S. 1161, 123 S.Ct. 966, 154 L.Ed.2d 897 (2003), the Eleventh Circuit explained that "[911 calls] are distinctive in that they concern contemporaneous emergency events, not general criminal behavior." *Id.* at 1339. It distinguished *J.L.* because it merely involved a report of general criminality, namely, a minor's possession of a firearm in violation of Florida law. Calls to 911, on the other hand, involve exigent situations that may limit the police's ability to gather identifying information. *Id.* at 1339 n. 7. Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the 911 system's usefulness. We do not believe that the Constitution requires that result. The touchstone of our search and seizure jurisprudence remains the Fourth Amendment's textual requirement that any search be "reasonable," a determination we make by weighing the competing interests of individual security and privacy with the need to promote legitimate governmental interests. *United States v. Knights*, 534 U.S. 112, 118–19, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (citations omitted). Having weighed those interests, we conclude that it is reasonable to accommodate the public's need for a prompt police response. The Fourth Amendment does not require the police to conduct further pre-response verification of a 911 caller's identity where the caller reports an emergency. Accordingly, an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality.

In this case, Mr. Domingis called 911 to report that Terry–Crespo had just threatened him with a firearm. His call reported both a potential crime as well as a physical threat to himself. Thus, this report differed from the anonymous tip reported in *J.L.* There, the alleged crime concerned general criminality, simple possession of a firearm by a minor, not a contemporaneous emergency event, such as Terry–Crespo's brandishing of a firearm in a high-crime area.

■ Third, the fact that Mr. Domingis risked any anonymity he might have enjoyed and exposed himself to legal sanction further supports the tip's reliability. "If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip." *Id.* at 276, 120 S.Ct. 1375 (Kennedy, J., concurring). Mr. Domingis jeopardized any anonymity he might have had by calling 911 and providing his name to an operator during a recorded call. That he did not know his return number—he explained that he was calling from another person's cellular telephone and did not know that number—did not diminish the risk of losing any anonymity. Merely calling 911 and having a recorded telephone conversation risks the possibility that the police could trace the call or identify Mr. Domingis by his voice. *See id.* Moreover, the district court could consider the 911 call reliable because Mr. Domingis risked criminal sanction for any false report to police. *See* Or. Rev. Stat. § 162.375(1) (2001) ("A person commits the crime of initiating a false report if the person knowingly initiates a false . . . report which is transmitted to a . . . law enforcement agency . . . that deals with emergencies involving danger to life or property.").

Fourth, the police could place additional reliability on Mr. Domingis's tip because his call evidenced first-hand information from a crime victim laboring under the stress of recent excitement. In *United*

*States v. Valentine*, 232 F.3d 350 (3d Cir. 2000), the Third Circuit upheld a search where an anonymous tipster's information was only a few minutes old. *Valentine* concluded that police may ascribe greater reliability to a tip, even an anonymous one, where an informant "was reporting what he had observed moments ago," not stale or second-hand information. *Id.* at 354. In addition to the first-hand and recent nature of the tip, the Portland police could accord greater weight to a victim's tip when he "seeks immediate police aid and gives a description of the assailant." *Adams v. Williams*, 407 U.S. 143, 147, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Here, Mr. Domingis, a victim-informant, sought immediate police assistance within minutes of being threatened and described the suspect and the threat. As with our approach in handling hearsay statements under the "excited utterance" exception, we deem such statements reliable because it is unlikely that the statements were contrived or the product of reflection. *Cf.* Fed. R.Evid. 803(2) (permitting as an exception to the hearsay rule "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition").

Terry–Crespo argues that the second 911 call could not form the basis of reasonable suspicion justifying the *Terry* stop. The audio recording of the second call indicates Mr. Domingis had initiated that 911 call prior to the *Terry* stop and then gave a contemporaneous account of the police arriving on the scene, then spotlighting and stopping Terry–Crespo. Although there is room in our precedent to conclude that the collective knowledge of law enforcement can support reasonable suspicion, even if the information known to others is not communicated to the detaining officer prior to a *Terry* stop, *cf. United States v. Butler*, 74 F.3d 916, 921 (9th Cir.1996) (holding that "collective knowl-

edge of police officers involved in an investigation, even if some of the information known to other officers is not communicated to the arresting officer" can establish probable cause), we do not need to rely on the second call. The first 911 call standing alone had sufficient indicia of reliability to provide Officer Kulp with reasonable articulable suspicion justifying the stop. Having reviewed the recorded call and transcript, we are of the opinion that the police reasonably relied on Mr. Domingis's tip.

B. *Crime of Violence Sentencing Enhancement*

■ The Guidelines enhance Terry–Crespo's base offense level to twenty if his prior Oregon felony conviction for unlawful use of a weapon constitutes a "crime of violence," as defined in U.S.S.G. § 4B1.2(a) (2002). U.S.S.G. § 2K2.1(a)(4)(A), cmt. n. 5. (2002). Section 4B1.2(a)(2) defines, in part, a "crime of violence" as "any offense under ... state law, punishable by imprisonment for a term exceeding one year, that ... involves conduct that *presents a serious potential risk of physical injury to another.*" (emphasis added). In applying this Guideline, we consider whether "the conduct set forth (*i.e.,* expressly charged) in the count of which the defendant was convicted ... by its nature, presented a serious potential risk of physical injury to another." U.S.S.G. § 4B1.2(a), cmt. n. 1. In addition to the indictment, we may examine documentation or judicially noticeable facts that establish that the conviction is a "crime of violence" for enhancement purposes. *United States v. Sandoval–Venegas*, 292 F.3d 1101, 1106 (9th Cir. 2002).

Here, we conclude that Terry–Crespo's prior conviction constitutes a "crime of violence" supporting the district court's enhancement. It is undisputed that he pleaded guilty to unlawful use of a weapon

under Oregon law, an offense punishable by imprisonment for more than one year. OR. REV. STAT. § 166.220(1)(b). Count four of the indictment expressly charged that Terry–Crespo "did unlawfully and intentionally discharge a firearm within the City limits of the City of Portland, at or in the direction of a building or structure within the range of said weapon without having legal authority for such discharge ...." The petition to plead guilty, signed and dated by Terry–Crespo, narrowed the basis for his conviction. Specifically, he pleaded guilty to "discharg[ing] a firearm in the direction of a *building* in Portland," and not at a structure. (emphasis added). This fact is significant: Shooting a firearm in the direction of a building located within a city's limits presents a serious potential risk of physical injury to others.

Urban areas are, by definition, more densely populated than rural ones. Accordingly, this serious potential risk of physical injury inherent in shooting at a building within a city's limits qualifies this particular Oregon offense as a crime of violence.

We reject Terry–Crespo's claim that his prior conviction can only qualify as a crime of violence when it is clear that the building in the direction of which he shot was actually occupied. Section 166.220(1)(b) criminalizes shooting a firearm in the direction of a "building," without qualifying it as "inhabited" or otherwise defining it. Therefore, Terry–Crespo contends that shooting a firearm in the direction of a building did not necessarily involve a serious potential risk of physical injury to another person: the building might have been vacant or otherwise uninhabited at the time and thus, he asserts, his offense would not have categorically presented a serious potential risk of physical injury to another.

Although § 166.220(1)(b) encompasses the discharge of a firearm in the direction of uninhabited as well as inhabited buildings, Terry–Crespo underestimates the serious potential risk of physical injury to others covered by this statute. Our opinion in *United States v. Weinert*, 1 F.3d 889 (9th Cir.1993), supports this conclusion. In *Weinert*, we considered whether a similar California statute that criminalized the malicious and willful discharge of a firearm at an inhabited dwelling constituted a "crime of violence" within the meaning of U.S.S.G. § 4B1.2. *Id.* at 891. California Penal Code § 246 defined what constituted "inhabited" as "currently being used for dwelling purposes, *whether occupied or not.*" (emphasis added). We concluded that a conviction under § 246 constituted a crime of violence, even though the statute permitted a conviction for shooting at an unoccupied dwelling. "[I]t is the risk inherent in the act of shooting at an inhabited building, as opposed to the presence of a victim, that makes this particular offense a crime of violence." *Weinert*, 1 F.3d at 891 (citation omitted). That the statute did not require an "inhabited" dwelling actually be occupied did not lessen the serious potential risk of physical injury to others because shooting at a dwelling by its nature presented a serious potential risk to neighboring residents, bystanders, and others. *Id.*

We do not think that *Weinert* is distinguishable from this case merely because the Oregon statute punishes discharging a weapon at a building within the city limits and not at an "inhabited" building as does the California statute. Oregon may properly concern itself with the risk of harm to persons who are within the city limits and near a building that is being fired upon. Such an act categorically "presents a serious potential risk of physical injury to another" and falls within the Guideline's definition of "crime of violence." Whether or not people inhabited the building, a serious potential risk of physical injury

resulted by the very nature of Terry–Crespo's act of firing his gun at a building located within Portland's city limits.

AFFIRMED.