**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ERNEST FOSTER, SR., as personal
representative of Ernest Foster, Jr.;
R. F., minor, by and through his
Guardian Ad Litem Raymond
Foster; A. F., minor, by and through
her Guardian Ad Litem Raymond
Foster; RAYMOND FOSTER,
individually, and as successors in
interest to Ernest Foster, Jr.,
deceased,
                    *Plaintiffs-Appellees*,

v.

CITY OF INDIO; RICHARD P. TWISS,
individually and in his capacity as
Indio Police Chief; DOES, 1 through
10, inclusive,
                    *Defendants*,

and

JEREMY HELLAWELL, individually
and in his capacity as an officer of
the Indio Police Department,
                    *Defendant-Appellant*.

No. 17-55167

D.C. No.
5:15-cv-01175-
FMO-DTB

OPINION

Appeal from the United States District Court
for the Central District of California
Fernando M. Olguin, District Judge, Presiding

Argued and Submitted March 6, 2018
Pasadena, California

Filed November 20, 2018

Before:  A. Wallace Tashima, Sandra S. Ikuta,
and Jacqueline H. Nguyen, Circuit Judges.

Per Curiam Opinion;
Dissent by Judge Ikuta

# SUMMARY[*]

### Civil Rights

The panel dismissed in part an appeal from the district court's order denying qualified immunity, and reversed in part the order, in an action brought pursuant to 42 U.S.C. § 1983 alleging that a police officer conducted an unlawful investigatory stop and used excessive deadly force when he shot Ernest Foster three times in the back during a response to a 911 call.

The panel held that it lacked jurisdiction, on interlocutory review, to consider questions of evidentiary sufficiency as to

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

the claims that the shooting violated Foster's Fourth Amendment right and the surviving family's Fourteenth Amendment rights. The panel held that on interlocutory appeal it could not reweigh the evidence to evaluate whether the district court properly determined there was a genuine issue of material fact, and therefore could neither credit defendant's testimony that Foster turned and pointed a gun at defendant, nor assume that Foster took other actions that would have been objectively threatening.

Addressing plaintiffs' claim that the officer violated Foster's Fourth Amendment rights by making an investigative stop of Foster and by approaching him with an unholstered gun, the panel held that it had jurisdiction to consider the claims because the facts were undisputed and the appeal raised a purely legal issue. The panel held that the officer did not violate clearly established law when he concluded, based on the 911 call, that he had reasonable suspicion to stop and investigate Foster. The panel further held that a reasonable officer in defendant's position could reasonably conclude that unholstering a gun during the stop did not constitute a violation of Foster's right to be free from excessive force.

Dissenting, Judge Ikuta stated that she disagreed with the majority's conclusion that it lacked jurisdiction to consider the district court's denial of qualified immunity as to plaintiffs' Fourteenth Amendment claim. Judge Ikuta wrote that, viewing the evidence in the light most favorable to the plaintiffs, no reasonable jury could find that the officer acted with a purpose to harm Foster for reasons unrelated to legitimate law enforcement objectives.

## COUNSEL

Konrad Muth Rasmussen (argued) and John P. McCormick, McCormick Mitchell & Rasmussen, San Diego, California, for Defendant-Appellant.

Justin Palmer (argued), Filer Palmer LLP, Long Beach, California; NaShaun Neal and Peter L. Carr IV, Sias Carr LLP, Los Angeles, California; for Plaintiffs-Appellees.

## OPINION

PER CURIAM:

Officer Jeremy Hellawell was dispatched to investigate a 911 call from a citizen who reported that a man matching Ernest Foster's description was walking toward a shopping plaza armed with a concealed handgun. As the incident unfolded, Hellawell approached Foster at the shopping plaza to investigate the report, Foster fled, and Hellawell ultimately shot Foster fatally three times in the back. Foster's family (the plaintiffs) claim that Hellawell violated Foster's Fourth Amendment rights and the plaintiffs' Fourteenth Amendment rights. The district court denied Hellawell's motion for summary judgment based on qualified immunity. Because we lack jurisdiction to consider questions of evidentiary sufficiency on interlocutory review, we dismiss Hellawell's appeal of the court's order with respect to the claims that the shooting violated Foster's Fourth Amendment right and plaintiffs' Fourteenth Amendment rights. We reverse the district court's denial of qualified immunity on Foster's other Fourth Amendment claims, because Hellawell's actions

during the investigative stop did not violate any clearly established law.

I

Because this case arises from the denial of Officer Hellawell's motion for summary judgment, we view the facts in the light most favorable to the nonmoving party, here, Foster's father and minor children (collectively, the "plaintiffs").[1] On July 4, 2013, at around 1:30 p.m., the City of Indio Police Department received an anonymous 911 call reporting an individual carrying a gun. The caller stated that a man "with a brown hat, aqua shirt, a blue aqua shirt, [and] black blue jeans" was "walking down Highway 111 toward subways and smoke shops with a handgun, with a . . . gun in his right side pocket." The caller also described the man as a "55-year-old African-American gentleman weighing about 250 pounds with a hand gun in his right side pocket" and a "baby brown or beige ball cap." The caller further stated that the man did not point the gun at him, but "walked out of the liquor store" and "just opened the gun." The caller further stated that the man "was no stress to me, but . . . he wants to let people know who he is."

The information provided by the caller was immediately dispatched over the police radio. Officer Hellawell received information that "a Black male wearing a tan hat, a[n] aqua-colored shirt, and dark-colored pants with a handgun in his pocket" was "last seen going towards Subway." Hellawell, who was wearing his police uniform, drove to the Indio Shopping Plaza near Highway 111, where the Subway was located. Because the Subway and Payday Advance Money

---

[1] We note where the facts are in dispute.

Store had been robbed in the past, Hellawell's first thoughts were that the tip might indicate a robbery was about to occur. Hellawell did not use his patrol car sirens on the way to the plaza and did not believe he was in danger "at that moment."

As Hellawell pulled into the parking lot near the Subway, he saw "a Black male wearing a[n] aqua-green shirt, wearing a tan hat and dark-colored pants" near the Subway. The man matched the description of the 911 call and, according to Hellawell, appeared nervous. The man, Ernest Foster, was standing against the wall next to the smoke shop adjacent to Subway. Hellawell exited his vehicle about ten feet from Foster. Hellawell did not see a gun in Foster's hands or on his person. Hellawell identified himself as a police officer and stated: "Let me see your hands. Keep your hands where I can see them. I just need to talk to you for a minute." At that point, Foster started running away from Hellawell. Hellawell gave chase. According to Hellawell, he might have drawn his gun either when Foster made a movement or started to run.[2] Hellawell subsequently re-holstered the gun, because he would not run with a gun in his hand.

Hellawell chased Foster through the shopping plaza then down an alley between two stores. According to Hellawell, throughout the pursuit, Hellawell told Foster to "stop," and to "show me your hands." Hellawell yelled: "I believe you have a gun. Stop or I am going to shoot." Hellawell testified that Foster's left hand was visible, but his right hand appeared to be holding something against his body. Hellawell did not see Foster holding a gun. At one point, Hellawell shot Foster

---

[2] Although one witness leaving Subway, Jose Flores, stated that he saw something in Hellawell's hands during the chase, no witness testified that Hellawell drew his gun as he approached Foster.

with his taser; although one dart hit Foster, the taser did not affect him because, according to Hellawell, the other dart was dragging along the ground.

As the chase went on, Hellawell shot Foster with his service firearm either just before or shortly after Foster rounded the corner of a nearby store. According to Hellawell, he shot Foster when he was turning toward him with a gun in his hand. This account was corroborated by Officer Felipe Escalante and a civilian witness, Daniel Kelley. Escalante had driven to the shopping center in response to Hellawell's report of foot pursuit. He testified that he saw Foster turn towards Hellawell and that Foster might have had "something" in his hands, but Escalante could not tell for sure. In a March 31, 2016 declaration, Kelley testified that he was smoking a cigarette outside of the Jack-in-the-Box, and saw Hellawell chase Foster behind the restaurant. He stated that as Foster ran by him, he saw Foster holding something in his hand. Kelley followed Hellawell, and saw Foster lying on the ground with a gun next to him.

Other witnesses offered differing accounts. Jaime Perez, who was waiting in his car in the parking lot, stated in his initial declaration on April 1, 2016, that he "saw a male running around the northeast corner of the AutoZone grasping an object up against his chest." He "watched the man go down" and he "noticed an object fall from his hand and land on the ground two feet in front of him." He stated that the object was a handgun. But in a second declaration on August 31, 2016, he stated that he had previously testified that he saw a gun fall from Foster's hands only because the police officers who interviewed him said they had found a gun and he was scared and nervous during his interview. In the August 31st declaration, Perez stated, "I did not see a gun.

Mr Foster did not point a gun at anyone, nor did I see a gun in his hand." Rather, according to Perez, Hellawell shot Foster in the back "for no reason," and Perez "did not see [] Foster bend, shift, twist, or make any sudden movements before [Hellawell] shot him."

A third witness, John-David Vallesillo, witnessed the chase from his car. In his interview with the police on the day of the shooting, Vallesillo stated that he heard a volley of shots, after which he turned his head and saw Foster "facing away from [Hellawell], falling forward onto his face onto the ground." Vallesillo further explained that from his perspective, "I didn't see a gun in [Foster's] hands at any point and it looked like he was, he got shot in the back." In a later declaration, dated August 31, 2016, Vallesillo again explained: "I heard a volley of shots coming from [the] general direction [of the police chase]. I also saw Mr. Foster fall face down onto the concrete." Vallesillo added that he "did not see Mr. Foster turn or bend towards the police officer" before the gunshots, "did not see Mr. Foster with a gun in his hand," and "did not see a gun on the sidewalk after the police officer shot him in the back."

Finally, Jose Flores, who observed the chase from his mother's car, testified that Foster did not turn toward Hellawell during the chase. Flores saw Foster "lying face down on the concrete," but "did not see a gun in [Foster's] hands or on the ground."

Foster was treated on the scene and later died at the hospital. The plaintiffs brought suit under 42 U.S.C. § 1983 against Hellawell, the City of Indio, the Indio Police Department, and Chief of Police Richard Twiss. They claimed violations of Foster's right to be free from excessive

force under the Fourth Amendment; violations of the family's right to familial association under the Fourteenth Amendment; and unconstitutional municipal customs, practices, and policies, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  The plaintiffs alleged that Hellawell (1) conducted an unlawful investigatory stop without reasonable suspicion; (2) used excessive force by drawing his firearm in conjunction with the investigatory stop; (3) used excessive force by shooting Foster with his taser during the foot chase; and (4) used excessive force by shooting Foster three times and killing him.  The defendants moved for summary judgment on all claims, arguing that qualified immunity applied and no violation occurred.

The court denied Hellawell's summary judgment motion on the majority of plaintiffs' Fourth and Fourteenth Amendment claims.  The court concluded that a genuine issue of material fact existed as to (1) whether Hellawell violated Foster's Fourth Amendment rights in making the investigative stop without reasonable suspicion; (2) whether Hellawell violated Foster's Fourth Amendment right to be free from excessive force by drawing his firearm during the investigatory stop; (3) whether Hellawell violated Foster's Fourth Amendment right to be free from excessive force by fatally shooting him; and (4) whether Hellawell violated the plaintiffs' Fourteenth Amendment rights because a reasonable jury could find that Hellawell shot Foster with a purpose to harm him without regard to legitimate law enforcement objectives.[3]

---

[3] The district court granted summary judgment in favor of Hellawell on plaintiffs' claim that Hellawell's use of a taser constituted excessive force.  The court also granted summary judgment in favor of the City of

Hellawell filed this interlocutory appeal from the denial of summary judgment.

II

The Supreme Court has held that "pretrial orders denying qualified immunity generally fall within the collateral order doctrine," *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014), and therefore, in the qualified immunity context, "we have jurisdiction over the denial of summary judgment, an interlocutory decision not normally appealable," *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013). "This is so because such orders conclusively determine whether the defendant is entitled to immunity from suit; this immunity issue is both important and completely separate from the merits of the action, and this question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost." *Plumhoff*, 134 S. Ct. at 2019.

Despite this general rule, "the scope of our review over the appeal [in this context] is circumscribed." *George*, 736 F.3d at 834. A public official may not immediately appeal "a *fact*-related dispute about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 307 (1995). In other words, where "a portion of a district court's summary judgment order" in a qualified immunity case "determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial," it is not a final decision under

Indio on plaintiffs' municipal liability claim, and in favor of Chief Twiss on plaintiffs' claim of supervisory liability.

the collateral order doctrine. *Id.* at 313. Accordingly, we have jurisdiction only to the extent "the issue appealed concerned, not which facts the parties might be able to prove, but, rather, whether or not certain given facts showed a violation of 'clearly established law.'" *Id.* at 311 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985)).

To the extent the district court's order denies summary judgment on purely legal issues, however, we do have jurisdiction. As *Plumhoff* explained, defendants' contention that their conduct "did not violate the Fourth Amendment and, in any event, did not violate clearly established law," raises legal issues that are "quite different from any purely factual issues that the trial court might confront if the case were tried." 134 S. Ct. at 2019. Deciding such legal issues "is a core responsibility of appellate courts, and requiring appellate courts to decide such issues is not an undue burden." *Id.* Therefore, we may address them on interlocutory appeal.

In deciding such legal claims, we apply the Supreme Court's qualified immunity standard. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). Although we do "not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

(quoting *Pauly*, 137 S. Ct. at 551). We may not "define clearly established law at a high level of generality." *Id.* at 1152 (quoting *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1776 (2015)). Rather, the clearly established law at issue "must be 'particularized' to the facts of the case." *Pauly*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). An officer cannot "have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 138 S. Ct. at 1153 (quoting *Plumhoff*, 134 S. Ct. at 2023). "In other words, immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Pauly*, 137 S. Ct. at 551 (quoting *Mullenix*, 136 S. Ct. at 308).

III

We turn first to Hellawell's appeal of the district court's denial of summary judgment on plaintiffs' claims that the fatal shooting of Foster violated his Fourth Amendment rights and plaintiffs' Fourteenth Amendment rights. The district court here concluded that genuine issues of material fact precluded summary judgment on both the Fourth and Fourteenth Amendment claims, because a reasonable jury could find that Hellawell shot Foster in the back while Foster was running away from him; that Foster was unarmed; and that Foster did not turn, bend, or look back at Hellawell in a manner that could make a reasonable officer fear being shot.

The legal standards for plaintiffs' Fourth and Fourteenth Amendment claims are not in dispute. It is clearly established law that shooting a fleeing suspect in the back violates the suspect's Fourth Amendment rights. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so. . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) (en banc). By contrast, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Garner*, 471 U.S. at 11. "Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given." *Id.* at 11–12.

In the Fourteenth Amendment context, it has been clearly established since 1998 "that a police officer violates the Fourteenth Amendment due process clause if he kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective." *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 450 (9th Cir. 2013). Legitimate law enforcement objectives include, among others, arrest, self-protection, and protection of the public. *See id*. at 454. A police officer lacks such legitimate law enforcement objectives when the officer "had any ulterior motives for using force against" the suspect, *see Gonzalez*, 747 F.3d at 797, such as "to bully a suspect or 'get even,'" *Wilkinson v.*

*Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008)), or when an officer uses force against a clearly harmless or subdued suspect, *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1170 (9th Cir. 2013); *see also Zion v. Cty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017) (holding that an officer may have violated the Fourteenth Amendment when, after shooting the suspect multiple times at close range, the officer took "a running start" and stomped on the suspect's head multiple times in succession), *cert. denied*, 138 S. Ct. 1548 (2018).

Rather than claim that an officer in Hellawell's position could have reasonably thought it was lawful to shoot a fleeing, unarmed suspect in the back, Hellawell argues that the evidence was insufficient to create a genuine issue of material fact regarding the plaintiffs' Fourth and Fourteenth Amendment claims. According to Hellawell, the district court erred by considering the evidence supporting plaintiffs' version of events. Hellawell argues that Vallesillo's testimony was immaterial because he was not in a position to see whether or not there was a gun and his declaration contradicted his initial statement to the police that he did not see the shots fired.[4] Likewise, Hellawell argues that Perez's

---

[4] Contrary to Hellawell's argument, Vallesillo's initial interview with the police does not contradict his earlier declaration. In his July 4, 2013 interview, Vallesillo stated: "I caught the last [shot] fired, I caught the last two shots and at that time [Foster] was facing away [from Hellawell] and still in the same position I saw him coming, like running, running away from [Hellawell], facing away [from Hellawell], falling forward onto his face onto the ground." In the August 31, 2016 declaration, he stated that he "did not see Mr. Foster turn or bend towards the police officer before I heard the gunshots." While these two statements are not identical, they are not inconsistent. Further, to the extent the two statements contradict

August 31, 2016 declaration is not entitled to weight because it contradicted his April 1, 2016 declaration. Hellawell contends that because the Perez and Vallesillo declarations contradict their earlier statements, the latter declarations are inadmissible as sham affidavits.

Instead of relying on these witnesses, Hellawell argues, the court should have relied on Hellawell's testimony. Hellawell contends that his statement that he saw a gun in Foster's hand is effectively undisputed, because the witnesses' testimony that they did not see a gun in Foster's possession does not mean there was no gun. According to Hellawell, he did not violate the Fourth Amendment, let alone any clearly established law, where he reasonably believed Foster posed a threat of serious physical harm. On the Fourteenth Amendment claim, Hellawell argues that he was engaged in a fast-moving situation and fired his gun when he believed Foster was turning toward him to shoot him. Thus, according to Hellawell, because his actions undisputedly served a legitimate governmental objective of defending himself and preventing an armed suspect's escape, there was no genuine issue of material fact regarding whether he had violated plaintiffs' Fourteenth Amendment rights.

We have previously rejected similar arguments. *See George*, 736 F.3d at 834–35. *George* involved a § 1983 excessive force claim against three sheriff's deputies who fatally shot an armed homeowner. *Id.* at 832–33. The district court denied the deputies' motion for qualified immunity on the ground that there "were genuine disputes of fact such that a reasonable jury could 'disbelieve the officers' testimony'

---

each other, we must resolve all factual disputes and draw all reasonable inferences in the plaintiffs' favor. *See George*, 736 F.3d at 836.

and rely on record evidence to conclude that [the victim] had not ignored commands to drop the gun, or taken other threatening measures such as pointing the weapon at deputies." *Id.* at 835.  On appeal, the deputies argued that the district court erred, because the plaintiff could not prove at trial that the homeowner did not turn and point his gun at deputies.  *Id.* at 834.  Like Officer Hellawell, the defendants in that case claimed "that a review of the district court's 'reasoning establishes that rather than delineating *actual material disputed facts*, [the court] commingled a group of insignificant discrepancies in statements' in order to conclude that a dispute existed about what had transpired during [the victim's] final minutes." *Id.*  We disagreed, stating that even though the officers used "the language of materiality, their argument actually goes to the sufficiency of [the plaintiff's] evidence," because "[a]t bottom, their contention is that [the plaintiff] could not 'prove at trial' that [the victim] did not turn and point his gun at deputies."  *Id.* (quoting *Johnson*, 515 U.S. at 313).  We concluded that we could "not decide at this interlocutory stage if the district court properly performed" its review of "whether there is enough evidence in the record for a jury to conclude that certain facts are true." *Id.* at 835 (quoting *Kinney v. Weaver*, 367 F.3d 337, 347 (5th Cir. 2004) (en banc)).

We decline review of Hellawell's arguments for the same reason.  As in *George*, Hellawell challenges the sufficiency of the plaintiffs' evidence; he argues that plaintiffs will not be able to prove at trial that he shot an unarmed suspect in the back without any provocation in violation of the Fourth and Fourteenth Amendments.  But this sort of "evidence sufficiency" claim does not raise a legal question. *Johnson*, 515 U.S. at 314.  We may not reweigh the evidence to evaluate whether the district court properly determined there

was a genuine issue of material fact, and therefore may "neither credit [Hellawell's] testimony that [Foster] turned and pointed his gun at [Hellawell], nor assume that [Foster] took other actions that would have been objectively threatening." *See George*, 736 F.3d at 834, 838. And even if we could consider Hellawell's sham affidavit argument on interlocutory review, we would reject it as meritless because the sham affidavit rule applies only to declarations by the parties, not to declarations by non-party witnesses like Perez and Vallesillo. *See Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009) ("The rationale underlying the sham affidavit rule is that a party ought not be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment. That concern does not necessarily apply when the dispute comes from the sworn deposition testimony of another witness.").[5]

Therefore, under *George*, we lack jurisdiction to consider Hellawell's argument that we should reverse the district court's determination that there was a genuine issue of material fact regarding plaintiffs' Fourth and Fourteenth Amendment claims relating to Hellawell's fatal shooting of Foster. *See George*, 736 F.3d at 835. We therefore dismiss Hellawell's appeal of these claims.

IV

We now turn to the plaintiffs' claims that Hellawell violated Foster's Fourth Amendment rights by making an

---

[5] Hellawell also argues that the district court erred in considering the plaintiffs' expert's report. Even if this was an error, it was harmless because other evidence in the record creates a genuine issue of material fact.

investigative stop of Foster and by approaching him with an unholstered gun.  Because the facts related to these claims are undisputed, Hellawell's appeal raises a purely legal issue: whether, based on undisputed facts, Hellawell violated clearly established law.  *See Plumhoff*, 134 S. Ct. at 2019; *Mitchell*, 472 U.S. at 528.  Thus, we have jurisdiction to consider Hellawell's appeal on interlocutory review.

A

A law enforcement officer may, consistent with the Fourth Amendment, conduct a "brief investigatory stop" of a suspect when the officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968).  The "reasonable suspicion" necessary to justify such a *Terry* stop depends "upon both the content of information possessed by police and its degree of reliability."  *Alabama v. White*, 496 U.S. 325, 330 (1990).  In applying this standard, we take into account the "totality of the circumstances."  *Id.* (quoting *Cortez*, 449 U.S. at 417).

For an anonymous tip to provide reasonable suspicion, the tip must contain "sufficient indicia of reliability," *White*, 496 U.S. at 327, that "criminal activity may be afoot," *Terry*, 392 U.S. at 30 (internal quotations omitted).  Thus, we must consider, based on the undisputed facts, whether it was clearly established at the time of the incident that the tip in this case: (1) was not sufficiently reliable and (2) did not provide information on potential illegal activity.

First, a reasonable officer in Hellawell's position could have concluded that the 911 call in this case demonstrated

"sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop." *White*, 496 U.S. at 327. One factor supporting the reliability of a tip is that the tipster claims eyewitness knowledge, coupled with sufficient detail in his description. *Illinois v. Gates*, 462 U.S. 213, 234 (1983) (stating that the tipster's "explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case"). A second factor supporting the reliability of the tip is that it predicts a suspect's future actions. Thus, *White* held that an anonymous tip had sufficient indicia of reliability to support reasonable suspicion in part because "the anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." 496 U.S. at 332 (alteration in original) (quoting *Gates*, 462 U.S. at 245). *White* differentiated between a caller's description of a car parked in front of an apartment building, which anyone could have "predicted" because it was existing at the time of the call, and a caller's ability to predict that the suspect would drive along a particular route. *Id.* Because the tipster correctly predicted the suspect's movement, a police officer could reasonably conclude that there was some degree of reliability to the tipster's claim that the suspect was engaged in criminal activity. *Id.* at 331–32. Finally, a caller's use of a 911 number makes the tip more credible because a 911 call can be recorded and callers can be traced. *See Florida v. J.L.*, 529 U.S. 266, 275–76 (2000) (Kennedy, J., concurring); *United States v. Terry-Crespo*, 356 F.3d 1170, 1175–76 (9th Cir. 2004). In addition, 911 calls are more credible "because the police must take 911 emergency calls seriously and respond with dispatch," when compared to non-emergency

tips concerning "general criminality." *Terry-Crespo*, 356 F.3d at 1176.

The tip in this case had several indicia of reliability. First, the tipster made a recorded 911 call. *See id.* at 1175–76. The tipster also claimed eyewitness knowledge of the concealed handgun and provided explicit detail about his observations, including that he personally observed the suspect taking out his gun in a manner "let[ting] people know who he is." *See Gates*, 462 U.S. at 234. Finally, the tipster stated that the suspect was walking down Highway 111 in the direction of the Subway and the smoke shops. Whether this was a prediction or merely an observation is unclear, but Hellawell corroborated this statement when he encountered the suspect at the specified location. *See White*, 496 U.S. at 331–32.

The plaintiffs argue that *Florida v. J.L.* clearly establishes that a reasonable officer should not have relied on the 911 call in this case because it lacked the necessary indicia of reliability. In *J.L.*, the police received an anonymous tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. An officer arrived at the bus stop, frisked J.L., and seized a gun from his pocket. *Id.* The Court held that the tip lacked "the moderate indicia of reliability" necessary to give rise to reasonable suspicion. *Id.* at 271. In reaching this conclusion, the Court noted that "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* at 271. Moreover, the tip itself consisted merely of "[a]n accurate description of a subject's readily observable location and appearance" and did not "show that

the tipster has knowledge of concealed criminal activity." *Id.* at 272.

Given the body of Supreme Court case law in existence at the time of the incident here, we cannot say that *J.L.* would have made it clear to a reasonable officer in Hellawell's position that the 911 call regarding Foster lacked sufficient indicia of reliability or placed this question "beyond debate." *See Kisela*, 138 S. Ct. at 1152 (quoting *Pauly*, 137 S. Ct. at 551). *J.L.* emphasized that the tipster in that case had not indicated the basis for his tip and had reported mere observations. 529 U.S. at 271. But here the tipster explained the basis of his knowledge, predicted the suspect's route, and made the tip via a recorded 911 call. A reasonable officer could rely on these facts when assessing the tip's reliability. *See J.L.*, 529 U.S. at 274–76 (Kennedy, J., concurring); *Terry-Crespo*, 356 F.3d at 1175–76. Further, in *J.L.* "the record did not indicate how long the police waited before responding to the tip," *United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 n.3 (9th Cir. 2003) (discussing *J.L.*, 529 U.S. at 268); in contrast, here Hellawell responded within minutes.

Accordingly, although the facts in *J.L.* are similar to the facts in this case, they are not identical, and other Supreme Court decisions provide a basis for a reasonable officer to conclude that the 911 call in this case had sufficient indicia of reliability. This conclusion is confirmed by the Supreme Court's subsequent determination in *Navarette v. California*, which distinguished *J.L.* on similar grounds to the ones at issue here. 572 U.S. 393, 397–400 (2014). In *Navarette*, the Court held that an anonymous tip has sufficient indicia of reliability to provide reasonable suspicion when the tipster accurately predicts a direction of travel, the tip is made

"contemporaneous[ly] with the observation of criminal activity," and the tip is made on the 911 system.  *Id.* at 400.

Second, a reasonable officer in Hellawell's position could have concluded that the tip in this case provided information on potential illegal activity.  Where state law makes it generally unlawful to carry a concealed weapon without a permit, a tip that a person is carrying a concealed firearm raises a reasonable suspicion of potential criminal activity, even if the tip does not state that the person is carrying the firearm illegally or is about to commit a crime.  *See United States v. Woods*, 747 F.3d 552, 556 (8th Cir. 2014) ("Considering Missouri law, and based on the call that there was an individual carrying a concealed weapon that had exited the bus, the officers had reason to believe criminal activity was afoot."); *United States v. Gatlin*, 613 F.3d 374, 378 (3rd Cir. 2010) ("[W]e hold that reasonable suspicion existed in this case based solely on the reliable tip from a known informant because carrying a concealed handgun is presumptively a crime in Delaware.").[6]

---

[6] Unpublished authority further bolsters our conclusion that a reasonable officer could consider the 911 call in this case to have sufficient indicia of reliability.  *See United States v. Bias*, 352 F. App'x 162, 163 (9th Cir. 2009) (holding that the fact that a "*Terry* stop was concluded in a county in which less than 1% of the population had a permit to carry a concealed weapon" contributed to reasonable suspicion that a person was carrying a concealed weapon and posed a threat of criminal activity); *United States v. Montague*, 437 F. App'x 833, 835–36 (11th Cir. 2011) (per curiam) (rejecting the argument that "the officers could not have reasonably suspected that [defendant] was engaging in criminal activity because under Florida law it is not illegal to possess a concealed weapon if the carrier has a permit").  We may look to such decisions when determining whether a right is clearly established and whether reasonable officials would know their actions violated such a right.  *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005).

Here, California law "generally prohibits carrying concealed firearms in public, whether loaded or unloaded." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (en banc); *see also* Cal. Penal Code § 25400 (crime of carrying a concealed firearm), § 25850 (crime of carrying a loaded firearm in public). Although "the prohibition of § 25400 does not apply to those who have been issued licenses to carry concealed weapons," *Peruta*, 824 F.3d at 926, California officials strictly limit the issuance of concealed carry permits, Cal. Penal Code § 26150(a).[7] As of December 2015, California had issued concealed carry permits to approximately .2% of its adult population of 29.9 million.[8] John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2016*, 17, 21, Crime Prevention Research Center (July 26, 2016), https://ssrn.com/abstract=2814691. Given the insignificant number of concealed carry permits issued in California, a reasonable officer could conclude that there is a high probability that a person identified in a 911 call as carrying a concealed handgun is violating California's gun laws.

---

[7] California law exempts certain small groups from the permit requirement, including retired or honorary peace officers, members of the Army, Navy, Air Force, Coast Guard, Marine Corps, or National Guard, and licensed hunters or fishermen. Cal. Penal Code §§ 25450, 25620, 25640.

[8] In Riverside County in 2016, less than .1% of adults had a concealed carry permit. *See* Brett Kelman, *Want to Carry a Gun in Riverside County? You Have to Wait 2 Years Just to Be Considered*, Desert Sun (Jan. 4, 2018), http://www.desertsun.com/story/news/crime_courts/2018/01/04/want-carry-gun-riverside-county-you-have-wait-two-years-just-considered/991704001/; *QuickFacts: Riverside County, California*, U.S. Census Bureau, http://www.census.gov/quickfacts/fact/table/riversidecountycalifornia/PST045217 (last visited Oct. 5, 2018).

Moreover, the Supreme Court has long held that even factors consistent with innocent conduct may give rise to reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Sokolow*, 490 U.S. 1, 9 (1989). For instance, although there is a small possibility that a person transporting cocaine has lawfully obtained it from the National Institute on Drug Abuse for research purposes, a reasonable officer can nevertheless have a reasonable suspicion of illegal activity when told that a person has been spotted transporting cocaine. Likewise, other circuits have rejected the argument that the possibility a person is lawfully carrying a firearm precludes reasonable suspicion. *See Woods*, 747 F.3d at 556; *Gatlin*, 613 F.3d at 378–79.

Accordingly, although a person exiting a liquor store with a concealed handgun in his right-hand pocket, walking in the direction of stores that had previously been robbed, may have had a concealed carry permit and been engaged in innocent activities, it would not violate clearly established law for a reasonable officer in Hellawell's position to conclude that the tip, corroborated by his own observations, gave rise to a reasonable suspicion that the man was engaged in criminal conduct.[9] Therefore, we determine that Hellawell did not

---

[9] We further note that "the existence of a statute or ordinance authorizing particular conduct" favors "the conclusion that a reasonable official would find that conduct constitutional." *Grossman v. City of Portland*, 33 F.3d 1200, 1209 (9th Cir. 1994); *see also Acosta v. City of Costa Mesa*, 718 F.3d 800, 824–26 (9th Cir. 2013). Here, § 25850(b) of the California Penal Code authorizes police officers "to examine any firearm carried by anyone on the person or in a vehicle while in any public place or on any public street in an incorporated city or prohibited area of an unincorporated territory." Therefore, an officer in Hellawell's situation could reasonably believe he had authority to examine any firearm Foster

violate clearly established law when he concluded, based on the 911 call, that he had reasonable suspicion to stop and investigate Foster. *See Kisela*, 138 S. Ct. at 1152. We reverse the district court's conclusion that Hellawell was not entitled to qualified immunity with respect to the stop.

### B

We next turn to the plaintiffs' claim that Hellawell violated Foster's Fourth Amendment rights in approaching him with a drawn gun.

In his deposition, Hellawell testified as follows:

> I don't recall drawing my gun, but I do remember fumbling with my holster as I ran behind Jack in the Box or on the side of Jack in the Box. I honestly can't sit there and tell you when I drew it. . . . Whether I drew it when he started to run or when he made some type of a movement as he began to run, I might have. I don't remember. But I do remember – as we ran along the west side of Jack in the Box, I remember fumbling with my holster because I will not run with my gun in my hand. So that's all I can recall on that subject.

Similarly, in his initial interview with the police investigator, Hellawell stated that "I initially had my gun out when he first started running because I believed he had a gun

---

might be carrying and could reasonably rely on § 25850(b) in stopping Foster.

– and because I don't like to run with my gun in my hand, I ended up holstering my gun." There is no other evidence in the record on this issue. Although the plaintiffs argue in their brief on appeal that Hellawell approached Foster "with his police firearm drawn," and pointed his firearm at Foster, no evidence in the record supports this claim. In addition to Hellawell's statements, the plaintiffs cite Flores's declaration, which states only that he saw Hellawell with something in his hand *during* the chase. Flores did not see Hellawell draw his firearm as he approached Foster.

Based on this record, the district court erred in finding a genuine dispute as to whether Hellawell approached Foster with his gun drawn.[10] The bare *allegation* alone, without any *evidence* in the record, is insufficient to conclude that Hellawell did anything more than unholster his gun during the initial encounter with Foster. The parties have not cited any case holding that merely unholstering a gun without pointing it at the suspect constitutes excessive force. We have held only that "*pointing* a loaded gun at a suspect, employing the threat of deadly force" may constitute excessive force. *Espinosa v. City & Cty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (emphasis added); *see also Tekle v. United States*, 511 F.3d 839, 845 (9th Cir. 2007) ("We have held that the pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury."); *Robinson v. Solano Cty.*, 278 F.3d 1007, 1015 (9th

---

[10] Although we do not ordinarily have jurisdiction on an interlocutory appeal to review a denial of qualified immunity based on the existence of a disputed fact, "[w]hen there is an *allegation* about the conduct part of the equation, but insufficient *evidence* of that conduct to create a genuine issue of material fact, our cases permit review." *See Jeffers v. Gomez*, 267 F.3d 895, 907 (9th Cir. 2001).

Cir. 2002) (en banc) (recognizing "as a general principle that pointing a gun to the head of an apparently unarmed suspect during an investigation can be a violation of the Fourth Amendment, especially where the individual poses no particular danger").  Neither we nor the Supreme Court have held that merely unholstering a firearm, without more, constitutes excessive force.  The plaintiffs' reliance on *Espinosa*, *Robinson*, and similar decisions is unpersuasive because each of those cases focuses on whether a gun was pointed at the suspect.  *See, e.g.*, *Espinosa*, 598 F.3d at 537; *Tekle*, 511 F.3d at 845; *Hopkins v. Bonvicino*, 573 F.3d 752, 761, 776–77 (9th Cir. 2009); *Robinson*, 278 F.3d at 1013.

Because a reasonable officer in Hellawell's position could reasonably conclude that unholstering a gun during the stop did not constitute a violation of Foster's right to be free from excessive force, we reverse the district court's conclusion that Hellawell was not entitled to qualified immunity on this point.

V

Because we lack jurisdiction to review Hellawell's claim that the district court erred in denying him qualified immunity for the fatal shooting of Foster, we dismiss Hellawell's appeal of this portion of the district court's ruling.  We conclude that Hellawell is entitled to qualified immunity for his initial stop of Foster, and therefore reverse the district court's denial of summary judgment on these Fourth Amendment claims.[11]

**DISMISSED IN PART AND REVERSED IN PART**.

---

[11] The parties shall bear their own costs on appeal.

IKUTA, Circuit Judge, dissenting:

I disagree with the majority's conclusion that we lack jurisdiction to consider Hellawell's appeal of the district court's denial of qualified immunity for the plaintiffs' Fourteenth Amendment claim. Here, viewing the evidence in the light most favorable to the plaintiffs, no reasonable jury could find that Hellawell acted with a "'purpose to harm' [Foster] for reasons unrelated to legitimate law enforcement objectives." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (en banc) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008)).

Because Foster matched the description of an individual reportedly carrying a firearm in the area, there is no genuine issue of triable fact as to whether Hellawell believed Foster to be armed. The evidence in the record is consistent with Hellawell's testimony that he used deadly force because he believed Foster was a fleeing and dangerous suspect in a crowded area on the Fourth of July.

Moreover, the plaintiffs have produced no evidence that Hellawell had "any ulterior motives for using force against" Foster, *Gonzalez*, 747 F.3d at 798, that Hellawell "did not believe he was responding to an emergency," *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008), or that Hellawell intended to "get even" with Foster, *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (quoting *Porter v. Osborn*, 546 F.3d 1131, 1140 (9th Cir. 2008)). Any "speculation" regarding "improper motive does not rise to the level of evidence sufficient to survive summary judgment." *See Gonzalez*, 747 F.3d at 798 (quoting *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003)).

Because, taken in the light most favorable to the plaintiffs, the undisputed facts show that Hellawell did not violate the Fourteenth Amendment, Hellawell is entitled to qualified immunity. I would hold that we have jurisdiction to consider his appeal of this claim and would remand to the district court to dismiss plaintiffs' Fourteenth Amendment claim.