# FOR PUBLICATION



**FILED**

Dec 07 2012, 10:37 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**THOMAS C. ALLEN**
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**AARON J. SPOLARICH**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| PHILLIP T. BILLINGSLEY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 02A05-1204-CR-216 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ALLEN SUPERIOR COURT
The Honorable Wendy W. Davis, Judge
Cause No. 02D04-1111-FD-1527

**December 7, 2012**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE

Phillip T. Billingsley appeals his conviction for possession of marijuana, as a Class D felony, following a bench trial. Billingsley raises three issues for our review, which we consolidate and restate as the following two issues:

1. Whether the officer responding to a 9-1-1 call initiated an investigatory stop of Billingsley or, instead, placed Billingsley under arrest when the officer withdrew his firearm upon his arrival at the scene; and

2. Whether the responding officer had a reasonable and articulable suspicion to initiate an investigatory stop of Billingsley.

We hold, based on the totality of the facts and circumstances available to the responding officer at the time he detained Billingsley, that the responding officer initiated an investigatory stop of Billingsley based on a reasonable and articulable suspicion that he was engaged in criminal activity. Accordingly, the trial court did not abuse its discretion when it admitted into evidence marijuana seized following the officer's detention of Billingsley, and we affirm his conviction.

## FACTS AND PROCEDURAL HISTORY

Around 2:34 a.m. on November 5, 2011, the 9-1-1 dispatch center of the Fort Wayne Police Department ("FWPD") received a call from a woman. The woman said there was a "young man" at the Veterans of Foreign Wars ("VFW") building who had "held [her] hostage" a week or two before and that she "want[ed] the police to come up here and lock him up." Def.'s Ex. B. She then stated that he was "going to leave right now" and that she did not "want him to leave because that's the same dude who did the shooting at Mookie's nightclub." Id. The caller stated that the man was currently armed,

2

though she could not specify the type of firearm; that his name was Phillip Billingsley; and that he was sitting as a passenger in a "newer," "tan-brown" or "tan-gray" Dodge Durango with tinted windows. Id. She further stated that the man sitting in the driver's seat of the vehicle was also armed.

During her five-minute phone call with 9-1-1, the caller turned her attention away from the dispatch operator to tell a third party that she was not "talking to the police I'm talking to my brother." Id. At the dispatch operator's request, the caller then identified herself as Renita Brown and said she was calling from a friend's cell phone. The FWPD dispatched Officer Nicholas Lichtsinn to the scene.

Officer Lichtsinn knew the VFW was "not the most friendly environment" and also knew Billingsley from having personally arrested him on prior allegations of possession of cocaine, resisting arrest, fleeing, and criminal trespass. Motion to Suppress Hearing Transcript at 14, 19. Officer Lichtsinn further knew that Billingsley had also been arrested for possession of a handgun by a felon and that Billingsley used to "hang around with" two people who have since been convicted of murder. Id. at 29.

Upon arriving at the VFW, Officer Lichtsinn did not see a Dodge Durango but did observe an SUV—a Chevrolet Trailblazer—that, "in the darker light . . . appear[ed] to be brown[, but] when the sun's out, it appear[ed] to be silver." Id. at 40. Officer Lichtsinn knew from his experiences as an officer that, "often when people call [9-1-1], colors [of vehicles] are goofy and makes and models of vehicles are goofy." Id. at 30. Officer Lichtsinn then observed Billingsley in the passenger seat of the Trailblazer and parked his patrol vehicle in front of the Trailblazer. Officer Lichtsinn called for backup and

3

exited his vehicle with his sidearm drawn. He ordered Billingsley to place his hands on the roof of the SUV while they waited for backup to arrive, which Billingsley did.

Backup officers arrived shortly thereafter. Officer Lichtsinn then holstered his weapon and ordered Billingsley to exit the vehicle. Officer Lichtsinn handcuffed Billingsley and patted him down for weapons. While doing so, Officer Lichtsinn smelled an "overpowering odor of [raw] marijuana," which he recognized based on "[n]umerous" prior arrests he had made involving marijuana. Id. at 18. Officer Lichtsinn then observed "on the front passenger seat where [Billingsley] was sitting . . . a clear plastic baggie containing . . . a green leafy plant substance that [Officer Lichtsinn] immediately recognized . . . to be marijuana." State's Exh. 1. The substance field tested positive for marijuana and was later measured at 229.7 grams. No firearm was found on or near Billingsley.

The State charged Billingsley with possession of marijuana, as a Class D felony. Billingsley moved to suppress the seized marijuana and, after a hearing, the trial court denied Billingsley's motion. Billingsley renewed his objections during the ensuing bench trial, and the court overruled them. The court then found Billingsley guilty as charged and sentenced him accordingly. This appeal ensued.

## DISCUSSION AND DECISION

Billingsley contends that the trial court abused its discretion when it admitted the seized marijuana into evidence because the State's seizure of the marijuana from the front passenger seat of the SUV violated his rights under the federal and Indiana constitutions. A trial court is afforded broad discretion in ruling on the admissibility of evidence, and

4

we will reverse such a ruling only upon a showing of an abuse of discretion. Washington v. State, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. Id. We will not reweigh the evidence, and we consider conflicting evidence in the light most favorable to the trial court's ruling. Cole v. State, 878 N.E.2d 882, 885 (Ind. Ct. App. 2007).

## Issue One: Investigatory Stop or Arrest

The parties first dispute whether Officer Lichtsinn exiting his vehicle with his firearm drawn upon his arrival at the VFW subjected Billingsley to an investigatory stop or an arrest. An investigatory stop allows a police officer to "temporarily freeze the situation in order to make an investigative inquiry." Johnson v. State, 766 N.E.2d 426, 429 (Ind. Ct. App. 2002), trans. denied. In Terry v. Ohio, 392 U.S. 1, 30 (1968), the United States Supreme Court held that an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop when, based on a totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. Hardister v. State, 849 N.E.2d 563, 570 (Ind. 2006). A Terry stop is a lesser intrusion on the person than an arrest and may include a request to see identification and inquiry necessary to confirm or dispel the officer's suspicions. Id. (citing Hiibel v. Sixth Judicial Dist. Court of Nev., 542 U.S. 177, 185-89 (2004)). Reasonable suspicion entails some minimal level of objective justification for making a stop, something more than an unparticularized suspicion or hunch, but less than the level of suspicion required for

probable cause. Wilson v. State, 670 N.E.2d 27, 29 (Ind. Ct. App. 1996) (citing United States v. Sokolow, 490 U.S. 1, 7 (1989)).

An arrest, on the other hand, occurs "when a police officer interrupts the freedom of the accused and restricts his liberty of movement." Sears v. State, 668 N.E.2d 662, 667 (Ind. 1996). An arrest requires probable cause. See, e.g., Reinhart v. State, 930 N.E.2d 42, 45 (Ind. Ct. App. 2010). There is no question that "[h]olding a person at gunpoint certainly restrains his liberty of movement" and may be an example of an arrest. Taylor v. State, 464 N.E.2d 1333, 1335 (Ind. Ct. App. 1984). But "there is no 'bright line' for evaluating whether an investigative detention is unreasonable" such that it has been transformed into a full arrest. See Mitchell v. State, 745 N.E.2d 775, 782 (Ind. 2001) (quoting United States v. Sharpe, 470 U.S. 675, 685 (1985)).

This court recently considered the fine line between an investigatory stop and an arrest when the attending officer has drawn his firearm. In Willis v. State, 907 N.E.2d 541, 545 (Ind. Ct. App. 2009), we held that, based on the facts of that case, an investigatory stop had occurred. In particular, we noted that "the police arrived at the scene moments after a caller reported a man holding a handgun to another man's head." Id. Upon arriving at the scene, the police immediately observed two individuals matching the description provided by the caller. We held that under the totality of those circumstances the police did not convert an investigatory stop into an arrest when they immediately withdrew their firearms to investigate whether the suspect had a firearm. Id.; accord United States v. Askew, 403 F.3d 496, 507 (7th Cir. 2005) (holding that officers conducted a Terry stop and not an arrest even though the officers blockaded

6

Askew's car and approached with guns drawn, based on the officers' "reasonable suspicion" that Askew was in the car and "the inherent danger in stopping those suspected of drug trafficking, for which guns are known tools of the trade").

About a year after this court's decision in Willis, we held on a different set of facts that an officer's withdrawal of his firearm from its holster placed the suspect citizen under arrest. Specifically, in Reinhart, we held as follows:

> Unlike in Willis, the facts presented here indicate that what may have begun as a Terry investigatory stop was quickly converted to an arrest requiring probable cause. "[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). Deputy Coney's purported purpose in stopping Reinhart's vehicle was to investigate a possible drunk driver. While Deputy Coney testified that, at the time of the stop, he was concerned with his safety based upon Reinhart's earlier behavior of pulling into the third driveway and yelling out the window, there is no evidence suggesting that Reinhart engaged in any behavior which could have led to a specific reasonable inference that he was armed with a weapon. Therefore, under the circumstances, Deputy Coney's action of ordering Reinhart to exit the vehicle at gunpoint was excessive.

930 N.E.2d at 47 (alteration original).

Thus, whether an officer's use of a firearm to detain a suspect is pursuant to an investigatory stop or an arrest is dependent on whether the totality of the facts and circumstances before the officer at that time demonstrated a specific and reasonable belief that the suspect may be armed with a weapon. Here, Officer Lichtsinn was responding to a call that Billingsley was armed at the VFW. Officer Lichtsinn knew the VFW to be a dangerous area, knew Billingsley, knew Billingsley to be a convicted felon, and knew Billingsley had a history of dangerous acquaintances. Upon his arrival at the VFW, Officer Lichtsinn immediately observed Billingsley sitting in the passenger seat of

7

a brown-gray SUV, which corroborated the caller's description of the scene. And Officer Lichtsinn's use of his firearm was limited. Namely, he had his firearm drawn only until backup arrived at the scene, at which time Officer Lichtsinn holstered his firearm and then further engaged Billingsley.

On these facts, Officer Lichtsinn withdrew his firearm only because he had a specific and reasonable belief that Billingsley may have been armed. As in Willis, it would have been unreasonable to expect Officer Lichtsinn to approach Billingsley without his gun drawn because the risk to the officer's safety was simply too great. 907 N.E.2d at 546. And Officer Lichtsinn's limited use of his firearm temporarily froze the situation until backup could arrive and he could complete his investigative inquiry in a safer environment without his firearm. We conclude that the totality of these circumstances describes an investigatory stop under Terry v. Ohio and not an arrest.

## Issue Two:  Reasonable Suspicion

Billingsley next asserts that, even under the standards for Terry stops, Officer Lichtsinn did not have a reasonable and articulable suspicion to stop Billingsley because the caller, Renita Brown, did not give police any personally identifying information and later was not located by either the State or Billingsley's defense counsel.[1] According to Billingsley, because Brown could not later be found, her call to the police is equivalent to an anonymous tip. We cannot agree.

As the Supreme Court of the United States has explained:

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with

---

[1] The parties do not describe the measures taken in the attempts to locate Brown.

8

information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. Adams v. Williams . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a Terry stop. 407 U.S.[ 143, 147 (1972).] Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," United States v. Cortez, 449 U.S. 411, 417[] (1981), that must be taken into account when evaluating whether there is reasonable suspicion.

Alabama v. White, 496 U.S. 325, 330 (1990).

The reasonable suspicion requirement is satisfied where the facts known to the officer at the moment of the stop, together with the reasonable inferences arising from such facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. Lyons v. State, 735 N.E.2d 1179, 1183-84 (Ind. Ct. App. 2000), trans. denied. Thus, reasonable suspicion entails something more than an inchoate and unparticularized suspicion or hunch but considerably less than proof of wrongdoing by a preponderance of the evidence. Luster v. State, 578 N.E.2d 740, 743 (Ind. Ct. App. 1991). We review a trial court's determination regarding reasonable suspicion de novo. Burkett v. State, 736 N.E.2d 304, 306 (Ind. Ct. App. 2000).

Brown's possible status as an anonymous caller presents an important question. As our supreme court has explained:

Reliability of the professional informant or anonymous tipster generally must be established by reference to underlying facts and circumstances which indicate that the information is trustworthy. Our requirement for corroboration is necessitated because this type of information may be unreliable or self-serving, especially if given in return for favors such as money or leniency in possible criminal prosecution. On the other hand, we

9

recognize a concerned citizen tip is different. This tip is made up of people who may have been victims of crime or have witnessed a crime. These individuals generally come forward with information out of a spirit of good citizenship and a desire to help law enforcement. Some jurisdictions have therefore held informants of this type are considered more reliable. In Kellems [v. State, 842 N.E.2d 352, 356 (Ind. 2006), rev'd on other grounds, 849 N.E.2d 1110 (Ind. 2006)], we again reaffirmed our belief that there "may well be great indicia of reliability in the report of the 'concerned citizen' as distinguished from the 'professional informant'—though again the totality of the circumstances controls." These concerned citizens are usually one-time informants, and no basis exists from prior contacts to determine their reliability . . . .

State v. Renzulli, 958 N.E.2d 1143, 1147 (Ind. 2011) (citations omitted); see also Florida

v. J.L., 529 U.S. 266, 270 (2000) (distinguishing known informants from anonymous

informants); Sellmer v. State, 842 N.E.2d 358, 361 (Ind. 2006) (describing the degree of

corroboration necessary before law enforcement may rely on an anonymous tip).

Here, Billingsley's argument for why Brown should have the status of an

anonymous caller is as follows:

The only identifying information the caller gave to the police when she called was her name. She did not provide a birth date, a telephone number, an address, or any other information which would allow the State to hold her "responsible" if her allegations turned out to be fabricated. In fact, the only information she gave which would have identified her turned out to be false as both the State of Indiana and the defense attorney attempted to no avail to locate her for purposes of having her testify at trial. . . . There was [also] no evidence put forth that the [FWPD] had th[e] technological tools available [to know the telephone number from which the call was placed].

Appellant's Br. at 15-16 (citations omitted). Billingsley also suggests that, since the

caller identified him by name, the caller must have had a questionable motive for the 9-1-

1 call.

Billingsley's argument misapplies our legal standards. Indeed, the crux of

Billingsley's legal position is that a caller who identifies herself by name can nonetheless

10

become anonymous after the fact when legal counsel fails to locate her. But "[t]hat ex post inquiry . . . is not our focus." United States v. Terry-Crespo, 356 F.3d 1170, 1174 (9th Cir. 2004). What matters is whether the facts known to Officer Lichtsinn at the moment of the stop, together with the reasonable inferences arising from those facts, would cause an ordinarily prudent person to believe that criminal activity has occurred or is about to occur. See Lyons, 735 N.E.2d at 1183-84. This is not to say that a caller who identifies herself by name can per se create reasonable suspicion. Again, whether reasonable suspicion exists requires us to consider the totality of the circumstances known to Officer Lichtsinn at the time of the stop. See id.

Moreover, Brown was not an anonymous caller but a concerned citizen. In her 9-1-1 call, she claimed both to have been a recent victim of Billingsley's criminal activity and to be witnessing his ongoing criminal activity. As an apparent concerned citizen, she was entitled to a degree of reliability despite the fact that "no basis exist[ed] from prior contacts to determine [her] reliability." Renzulli, 958 N.E.2d at 1147; see also Kellems, 842 N.E.2d at 356-57 (holding that a caller who had reported an intoxicated driver was not an anonymous caller but a concerned citizen because she had provided her name, even though her identity could not later be verified).

On these facts, we conclude that Officer Lichtsinn had reasonable suspicion to briefly detain Billingsley. At the time he stopped Billingsley, Officer Lichtsinn had been informed by a 9-1-1 caller identified by name that a known felon had a firearm, contrary to Indiana Code Section 35-47-2-23(c)(2)(B), in a dangerous area at about 2:30 in the morning. Upon arriving at the scene, Officer Lichtsinn immediately observed Billingsley

11

in the passenger seat of a brown-gray SUV, which he reasonably believed to be consistent with Brown's description of the scene.

Billingsley notes that Brown's description of the scene was based on information generally available to the public and was therefore not quality information on which to support a finding of reasonable suspicion. But Brown's specific identification of Billingsley lends her description of the scene greater credibility than that of the general public.

Further, because Officer Lichtsinn reasonably believed that the caller was a concerned citizen, one reasonable inference is that he believed Brown could later be located and held accountable for false reporting. See J.L., 529 U.S. at 270. Stated another way, it is reasonable for the police to believe that a 9-1-1 caller has provided her real name. See Renzulli, 958 N.E.2d at 1147; Kellems, 842 N.E.2d 356-57. As the Ninth Circuit Court of Appeals has stated:

> We acknowledge that any given caller reporting an emergency to [9-1-1] could provide a false name. . . . We decline to impose a duty on the police to confirm the identity of every [9-1-1] caller who provides his or her name or to know the universe of names in the United States and their endless variants.

Terry-Crespo, 356 F.3d at 1175. Accordingly, Brown's 9-1-1 call "was not anonymous and therefore was entitled to greater reliability." Id. at 1174; see Renzulli, 958 N.E.2d at 1147.

Finally, the fact that Brown called 9-1-1 rather than a police station entitles the call to a degree of reliability. Calls to 9-1-1 are "entitled to greater reliability than a tip concerning general criminality because the police must take [9-1-1] emergency calls

seriously and respond with dispatch." Terry-Crespo, 356 F.3d at 1176 (discussing United States v. Holloway, 290 F.3d 1331, 1339 (11th Cir. 2002), cert. denied, 537 U.S. 1161 (2003)). Calls to 9-1-1

> involve exigent situations that may limit the police's ability to gather identifying information. Police delay while attempting to verify an identity or seek corroboration of a reported emergency may prove costly to public safety and undermine the [9-1-1] system's usefulness. We do not believe that the Constitution requires that result. The touchstone of our search and seizure jurisprudence remains the Fourth Amendment's textual requirement that any search be "reasonable," a determination we make by weighing the competing interests of individual security and privacy with the need to promote legitimate governmental interests. Having weighed those interests, we conclude that it is reasonable to accommodate the public's need for a prompt police response. The Fourth Amendment does not require the police to conduct further pre-response verification of a [9-1-1] caller's identity where the caller reports an emergency. Accordingly, an emergency [9-1-1] call is entitled to greater reliability than an anonymous tip concerning general criminality.

Id. (citations omitted); see also Kellems, 842 N.E.2d at 356-57 (holding that the exigent circumstances described by a concerned citizen were "particularly relevant" to justifying the need for a Terry stop).

In sum, based on the totality of the facts and circumstances known to Officer Lichtsinn at the time he detained Billingsley, we conclude that Officer Lichtsinn had a reasonable and articulable suspicion that Billingsley may have been involved in criminal activity. Officer Lichtsinn had been informed, by a concerned citizen who had called 9-1-1, of a known felon with a firearm at a location known to be dangerous. Accordingly, Officer Lichtsinn's Terry stop of Billingsley did not violate Billinglsey's Fourth Amendment rights. For the same reasons, Billingsley's claim under Article I, Section 11

13

of the Indiana Constitution must fail.[2] E.g., <u>Sowers v. State</u>, 724 N.E.2d 588, 591-92 (Ind. 2000).

## Conclusion

Officer Lichtsinn lawfully detained Billingsley during an investigatory stop. Accordingly, the State lawfully seized the discovered marijuana and the trial court did not abuse its discretion in admitting that evidence against Billingsley. Thus, we affirm Billingsley's conviction.

Affirmed.

MAY, J., concurs.

KIRSCH, J., dissents with separate opinion.

---

[2] In reviewing claims under Article I, Section 11, we balance three factors to determine the reasonableness of a search or seizure: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. <u>Litchfield v. State</u>, 824 N.E.2d 356, 361 (Ind. 2005). The State asserts, and we agree, that Billingsley's argument fails to address the second and third prongs under Article I, Section 11.

# IN THE
# COURT OF APPEALS OF INDIANA

PHILLIP T. BILLINGSLEY,        )
                                      )
      Appellant-Defendant,      )
                                      )
          vs.                  )     No.  02A05-1204-CR-216
                                      )
STATE OF INDIANA,           )
                                      )
      Appellee-Plaintiff.        )

**KIRSCH, Judge,** *dissenting*.

I respectfully dissent.

To conduct an investigatory stop, a police officer must have a reasonably articulable suspicion of criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 20 (1968). To determine whether a citizen's constitutional rights are violated by such a stop, the Supreme Courts of the United States and of Indiana have directed reviewing courts to look at the "'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *U.S. v. Arvizu,* 534 U.S. 266, 274 (2002), *State v. Bulington,* 802 N.E.2d 435, 438 (Ind. 2004).

Both courts have also held as a general matter that "an anonymous tip alone is not likely to constitute the reasonable suspicion necessary for a valid Terry stop." *Lampkins*

15

*v. State,* 682 N.E.2d 1268, 1271 (Ind. 1997) (citing *Alabama v. White,* 496 U.S. 325, 329-30 (1990)). The concern about uncorroborated anonymous tips arises because "[i]f any anonymous caller's allegation, uncorroborated by anything beyond public knowledge, could justify a search, every citizen's home [and car for that matter] would be fair game for a variety of innocent and not so innocent intrusions." *Jaggers v. State,* 687 N.E.2d 180, 183 (Ind. 1997).

For an officer to have a "'particularized and objective basis' for suspecting legal wrongdoing, significant aspects of the tip must be corroborated by the police." *Lampkins,* 682 N.E.2d at 1271. The corroboration requirement will be satisfied if the anonymous tip gives the police something more than details readily obtainable by the general public. *See Johnson v. State,* 659 N.E.2d 116, 119 (Ind. 1995) (holding that anonymous tip that provided only information easily obtainable by members of general public was insufficiently reliable to constitute reasonable suspicion to conduct investigatory stop). In addition, to constitute reasonable suspicion for an investigatory stop, an anonymous tip must also demonstrate an intimate familiarity with the suspect's affairs and be able to predict future behavior. *See id.* at 118.

Here, the police received a tip from a 9-1-1 caller who, in response to police questioning, gave her name as "Renita Brown." She was neither asked for, nor provided, any other information about her identity such as her age, address, or Social Security Number. The caller could not be located by either the State or the defense, and it is not known whether the caller was, in fact, "Renita Brown" or whether the caller provided a

16

false name.  Nothing known to the police officer, nor provided to this court, allow us to determine the accuracy or inaccuracy of the identification information.

In regard to the other information provided in the 9-1-1 call, the only information that was accurate was that Phillip Billingsley was in the passenger seat of an SUV in the parking lot of the Fort Wayne VFW and that the SUV could appear to be brown when viewed "in a darker light."  Other than Billingsley's name, there was no information that provided details that would not be known to the general public, there was no information that demonstrated "an intimate familiarity" with Billingsley's affairs, and there was no information that demonstrated an ability to predict future behavior.  None of the other information provided during the call was verified by the officer before conducting the investigatory stop.   Indeed, none of such information was ever shown to be accurate.

Because there was no supporting information or any other indicia of reliability for the name provided, I do not believe that the mere providing of a name by a 9-1-1 caller removes this case from the category of an anonymous caller.  I also do not believe that the information known to the investigating officer was sufficient to satisfy the standards established by our Supreme Court and the Supreme Court of the United States for investigatory stops.  Accordingly, I would reverse Billingsley's conviction.