## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 23 2019, 10:31 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Russell W. Brown, Jr.
King, Brown & Murdaugh, LLC
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Carl L. Dahlin,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 23, 2019

Court of Appeals Case No.
64A04-1607-CR-1716

Appeal from the Porter Superior Court

The Honorable Mary R. Harper, Judge

Trial Court Cause No.
64D05-1512-F5-11081

**Crone, Judge.**

# Case Summary

[1] Following a jury trial, Carl L. Dahlin appeals his conviction for level 5 felony carrying a handgun without a license with a prior felony conviction within the last fifteen years. Dahlin argues that a police officer's removal of a handgun case from his car without a warrant violated his constitutional right against unreasonable searches and seizures, and therefore the trial court erred in admitting evidence regarding the case and the handgun found inside it. Dahlin also argues that the evidence presented at trial is insufficient to support his conviction. We conclude that any error in the admission of evidence regarding the case and the handgun was harmless and that the evidence is sufficient to support Dahlin's conviction. Therefore, we affirm.

# Facts and Procedural History[1]

[2] The facts most favorable to the jury's verdict are as follows. On December 3, 2015, Dahlin was convicted of two counts of class D felony theft. On December 20, 2015, he was released from jail and went to live with his father in Valparaiso in Porter County.

[3] At approximately 4:20 p.m. on December 25, 2015, Officer Charles Gambrel from the Westville Police Department in LaPorte County stopped at a gas station in Valparaiso on his way home from work. The sky was dark, and the

---

[1] We heard oral argument on April 19, 2019, at John Adams High School in South Bend. We thank the faculty, staff, and students for their hospitality and thoughtful questions, and we thank counsel for their excellent advocacy.

temperature was approximately fifty degrees. Officer Gambrel went inside the station, and the clerk told him that there was a person "parked outside" who was "slumped over" his steering wheel and had been there "a long time." Trial Tr. Vol. 1 at 100. The officer asked the clerk if she had called 911, and she said yes. He told her to call 911 again and let them know that he was "out there" and "needed assistance"; as a law enforcement officer from LaPorte County, he had "no way of contacting the Porter County dispatch system." *Id.*

[4] Officer Gambrel went outside and approached a white Nissan Altima with black interior that was parked diagonally in a parallel parking space with its engine running. *Id.* at 167. The driver's side window was down; the windshield wipers were on, although it wasn't raining; and "[t]he radio was going." *Id.* at 101. The officer noticed Dahlin "slumped over the front of the [steering] wheel." *Id.* Officer Gambrel asked Dahlin if he was "okay" and "got no response." *Id.* The officer "knocked on the side of the door, still with no response." *Id.* Then the officer "poked" Dahlin in the shoulder with his index finger. *Id.* "At that time, [Dahlin] jumped up, got in a boxing stance as he was still [sitting] in the car, like [the officer] scared him." *Id.* at 102.

[5] Officer Gambrel asked Dahlin "what was going on." *Id.* Dahlin replied that he was "going through the car wash and doing scratch offs." *Id.* The officer did not see any scratch-off lottery tickets in Dahlin's lap. Officer Gambrel stated that "the clerk was concerned for [Dahlin's] safety" and that he "was there to make sure [Dahlin] was okay." *Id.* at 103. Officer Gambrel asked Dahlin "if he was on any kind of medications[,]" and Dahlin said that "he was not." *Id.*

The officer asked Dahlin "if he would provide some kind of ID[,]" and Dahlin began to "fumble around looking for his ID." *Id.* Dahlin gave Officer Gambrel his insurance card and said that "he could not find his [driver's] license[.]" *Id.* At that moment, the gas station clerk handed the officer the phone that she had used to call 911. Officer Gambrel "walked to the back of the car," got the license plate information, and had the 911 dispatch operator "run the plates." *Id.* at 104. The Nissan was registered to Dahlin's mother, who had been killed in a traffic accident exactly two years earlier; Dahlin's father had renewed the license plates in her name.

[6] From his vantage point, Officer Gambrel saw Dahlin do "a lot of fumbling around" with the center console and a backpack that was located on the front passenger seat. *Id.* The officer "positioned [himself] a little closer to the front" of the car so he could "see exactly what [Dahlin] was doing." *Id.* He "noticed the corner part of" what he recognized to be a black Glock handgun case that was "[p]artially underneath" the backpack. *Id.* at 105. The officer asked Dahlin if he had a handgun license. Dahlin said that he did.[2] Officer Gambrel asked if Dahlin "had a gun in the car. He said yes" and that the gun belonged to his father. *Id.* at 106. The officer asked "if [Dahlin] would be willing to step out of the car and talk to [him]." *Id.* Dahlin opened the driver's side door (which stayed open), exited the car, and leaned against the rear driver's side

---

[2] *See* Trial Tr. Vol. 1 at 124 (Officer Gambrel acknowledging that it was not "the first time [he] ever encountered someone that had a gun in a car with a handgun permit").

quarter panel. Officer Gambrel asked where the gun was, and Dahlin replied that "it was on the passenger floor." *Id*. at 107. Dahlin's speech was "kind of slurred[,]" and "[h]is balance was unsteady" as he leaned against the car. *Id*. at 108.

[7] Several Valparaiso Police Department officers responded to the clerk's 911 call and arrived at the gas station almost simultaneously at 4:30 p.m. Officer Michael Trueblood parked behind Dahlin's car to "box it in[.]" *Id*. at 131. Officer Trueblood approached Officer Gambrel, who told him that "there was a firearm in the vehicle[.]" *Id*. at 132. Officer Trueblood "looked inside the vehicle" and saw what he recognized to be a "standard Glock box." *Id*. The officer "walked over to the passenger side of the vehicle and opened the door and grabbed the box." *Id*. at 133.[3] He

> opened the box, saw that there was a firearm inside the box. [He] ejected the magazine from the firearm. Pulled the slide back on top of the firearm. Locked it in place. Put the firearm on top on top of the car. Put the magazine in [his] pocket. And then [he] put the firearm inside [his] police vehicle and locked [his] police vehicle.

---

[3] When asked why he did so, Officer Trueblood replied,

> Because when we're on a scene and there's a firearm that's unattended for [sic] it's in our best interest for our safety and everyone else's safety on the scene, including the person we're talking with, any patrons of the gas station, gas station employees to make sure all deadly weapons are accounted for and secured.

Trial Tr. Vol. 1 at 133.

*Id*.[4]  Officer Trueblood did not pat Dahlin down for weapons because he "just assumed" that Officer Gambrel had done so, which he had not.  *Id*. at 134.

[8]    Officers Patrick Yokovich and John Watson arrived at the gas station as Officer Trueblood was placing the handgun on the roof of the Nissan.  *Id*. at 166.  At that point, the officers were informed that Dahlin had a valid handgun license.  Officer Jason Hamilton was talking with Dahlin and Officer Gambrel.  Officer Yokovich, who was the lead officer at the scene, "asked Officer Hamilton what was going on, and he [replied] that it was just a possible OWI [operating while intoxicated] investigation at this point.  And they had just removed the gun for safekeeping."  *Id*. at 167.

[9]    Officer Yokovich "walked Mr. Dahlin over to a flat well-lit area of the parking lot" and "attempted to administer field sobriety tests to him."  *Id*. at 168.  The officer did not make Dahlin perform a horizontal gaze nystagmus test because Dahlin claimed to be "legally blind without his glasses on[,]" and he did not make Dahlin perform the "walk and turn or one leg stand test[s]" because Dahlin "advised [the officer] that he had a torn meniscus" in "his right knee."  *Id*.  The officer directed Dahlin to recite the alphabet forward from C to R and count backward from 62 to 31, and Dahlin "was able to do both of those."  *Id*. at 169.  Officer Yokovich did not "smell any alcohol" on Dahlin and did not

---

[4] Officer Trueblood testified that the handgun wasn't ready to fire when he opened the case.  He confirmed that "there was one bullet in the magazine" and that "[i]n order to fire that gun someone would have had to take it, pull the slide back, and then that one bullet would have been in a fireable position[.]"  Trial Tr. Vol. 1 at 145, 146.

administer a portable breath test. *Id*. at 176. Dahlin admitted that he had taken medication for which he had a prescription, and that the bottle was in the backpack. According to Officer Yokovich, "given the circumstances, the vehicle was parked, and nobody really saw [Dahlin] drive, [he] just didn't feel comfortable proceeding for the OWI investigation even though [he] probably could have." *Id*. at 169.

[10] As Dahlin was talking with Officer Yokovich, he admitted "that he had just gotten out of jail a couple days ago." *Id*. at 170. The officers' attention was "drawn to that because [Dahlin] had had a firearm in his vehicle[,]" and they "asked him what he had gotten out of jail for." *Id*. Dahlin "advised that it had been a felony Theft." *Id*. "[K]nowing that [a person is] not allowed to possess a firearm if [he has] a felony conviction," the officers needed to "gather more information on that." *Id*.[5] "Officer Hamilton called dispatch, and they advised that" Dahlin had been convicted of class D felony theft on December 3. *Id*. "And because of that conviction he was no longer eligible to possess a firearm." *Id*. The handgun's serial number was "provided to dispatch. And the only thing that dispatch came back with was that the gun was a Signal 80, which means that it's not stolen. It didn't have any information about the registered

---

[5] *See* Ind. Code §§ 35-47-2-3(e) (providing that a lifetime license to carry a handgun, which Dahlin had, "is automatically revoked if the license holder does not remain a proper person" to be licensed) and 35-47-1-7 (defining "proper person" as "a person who … does not have a conviction for a crime for which the person could have been sentenced for more than one (1) year[,]" i.e., a felony).

owner." *Id.* at 173. The officers contacted a prosecutor, who told them to "go ahead and take [Dahlin] for Felon in Possession of a Firearm." *Id.* at 172.

[11] On December 28, 2015, the State charged Dahlin with level 5 felony carrying a handgun without a license with a prior felony conviction within the last fifteen years. *See* Ind. Code § 35-47-2-1 (providing that "[a] person shall not carry a handgun in any vehicle or on or about the person's body without being licensed under this chapter to carry a handgun" and that "[a] person who knowingly or intentionally violates this section" commits a level 5 felony if the person "has been convicted of a felony within fifteen (15) years before the date of the offense."). In March 2016, Dahlin filed a motion to suppress evidence regarding the handgun and the case, which he argued were obtained in violation of his constitutional right against unreasonable searches and seizures. After a hearing, the trial court issued an order denying the motion.

[12] A jury trial was held in May 2016. At the beginning of trial, Dahlin raised what we perceive to be a continuing objection to "the introduction of the firearm" and "testimony regarding the handgun" based on the arguments he had made at the suppression hearing, and the trial court overruled his objection. Trial Tr. Vol. 1 at 87-88. Officers Gambrel, Trueblood, and Yokovich testified for the State. Dahlin's elderly father ("Dahlin Senior") and Dahlin testified on Dahlin's behalf. According to Dahlin Senior, Dahlin was going to take Dahlin Senior's truck to a Christmas party on December 25, but Dahlin Senior told him to take the Nissan "because the truck [wasn't] running good[.]" *Id.* at 234. Dahlin Senior claimed that the handgun and the case belonged to him, that he

had forgotten that he had left them on the front seat of the Nissan on December 23 or 24, and that he had not told Dahlin that he had left them there.

[13] Dahlin testified that he was going to take his father's truck to a party on December 25, but his father told him to take the Nissan instead because the truck had "not been running that well[.]" Trial Tr. Vol. 2 at 4. Dahlin got out of the truck, "threw" his backpack onto the Nissan's front passenger seat, and drove to the gas station to buy a beverage, lottery tickets, and cigarettes. *Id*. at 6. The drive took about five minutes. He parked, went inside, bought the items, and returned to the car. He was "scratching off tickets" when Officer Gambrel approached and asked for his driver's license and registration. *Id*. at 8. He retrieved his license from his wallet and was looking for the registration when he moved the backpack and "saw the Glock case sitting on the passenger side." *Id*. at 10.[6] According to Dahlin, he had not seen the case before then because "it was dark out. It [the case] was black. [His] backpack was on top of it. The car seats were black." *Id*. Dahlin stated, "[W]hen I saw the gun case I notified the officers. I mean, not only for their safety, but for my safety. I mean, officers if think [sic] you're carrying a gun I don't know what may happen." *Id*. at 15.

---

[6] Officer Yokovich testified that Dahlin told him that the handgun case had originally been in the backpack and that the backpack belonged to his father. The officer asked Dahlin why the case was out of the backpack, and he replied that "he had to remove it from the backpack to get his wallet." Trial Tr. Vol. 1 at 171. The officer obtained Dahlin's consent to search the backpack, in which he found a bottle of Dahlin's medication. The officer testified, "And then I said well, if this is your dad's backpack why is -- why was your wallet in it and why was your medication in it. And [Dahlin] advised that they share the backpack." *Id*.

[14] The jury found Dahlin guilty as charged. The trial court sentenced him to four years, with 182 days executed and the rest suspended to probation. Dahlin filed a timely notice of appeal, but the appeal was dismissed with prejudice in December 2016 because he had failed to file an appellant's brief. In July 2018, Dahlin sought permission to pursue a belated appeal, which was granted.

## Discussion and Decision

## Section 1 – Any error in the admission of evidence regarding the handgun case and the handgun was harmless.

[15] "The Fourth Amendment to the U.S. Constitution protects persons from unreasonable search and seizure by prohibiting, as a general rule, searches and seizures conducted without a warrant supported by probable cause." *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013).[7] "This provision applies to the states through the Fourteenth Amendment." *Schlechty v. State*, 926 N.E.32d 1, 3 n.1 (Ind. 2010). The fundamental purpose of the Fourth Amendment "is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Taylor v. State*, 842 N.E.2d 327, 330 (Ind. 2006).

---

[7] The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article 1, Section 11 of the Indiana Constitution has nearly identical wording, but "Indiana courts 'interpret and apply Section 11 independently from federal Fourth Amendment jurisprudence.'" *Francis v. State*, 764 N.E.2d 641, 646 (Ind. Ct. App. 2002) (quoting *Mitchell v. State*, 745 N.E.2d 775, 786 (Ind. 2001)). Dahlin asserts that the seizure of the handgun case violated both the Fourth Amendment and Section 11, but he offers no analysis under the Indiana Constitution beyond reciting the three-part test from *Litchfield v. State*, 824 N.E.2d 356 (Ind. 2005). The State argues, and we agree, that he has therefore "waived any claim of error" under Section 11. *Id.* at 647.

"A citizen does not surrender all the protections of the Fourth Amendment by entering an automobile." *New York v. Class*, 475 U.S. 106, 112 (1986). "While the interior of an automobile is not subject to the same expectations of privacy that exist with respect to one's home, a car's interior as a whole is nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the police." *Id*. at 114-15.

[16] Under the Fourth Amendment, "[a] warrantless search or seizure is per se unreasonable, and the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies." *Erickson v. State*, 72 N.E.3d 965, 970 (Ind. Ct. App. 2017) (quoting *Holder v. State*, 847 N.E.2d 930, 935 (Ind. 2006)), *trans. denied*. "[W]hen evidence is obtained in violation of the constitution, such evidence may not be used against a defendant at trial." *Osborne v. State*, 805 N.E.2d 435, 439 (Ind. Ct. App. 2004), *trans. denied*. The exclusionary rule "is a judicially created remedy designed to safeguard the right of people to be free from unreasonable searches and seizures by deterring police misconduct." *Hendricks v. State*, 897 N.E.2d 1208, 1212 (Ind. Ct. App. 2008).

[17] Dahlin contends that the warrantless seizure of the handgun case was unconstitutional, and therefore any evidence regarding the case and the handgun found inside it should have been excluded at trial. "In general, rulings on the admissibility of evidence are reviewed for an abuse of discretion and reversed when admission is clearly against the logic and effect of the facts and circumstances." *Stickrod v. State*, 108 N.E.3d 385, 388 (Ind. Ct. App. 2018), *trans. denied*. "We will not reweigh the evidence and will resolve any conflicts

in the evidence in favor of the trial court's ruling." *Holloway v. State*, 69 N.E.3d 924, 929 (Ind. Ct. App. 2017), *trans. denied*. "When a challenge to such a ruling is based on the constitutionality of the search or seizure of evidence, it raises a question of law that we review de novo." *Id*.[8]

[18] We note that "there are three levels of police investigation, two of which implicate the Fourth Amendment and one of which does not." *Negash v. State*, 113 N.E.3d 1281, 1288 (Ind. Ct. App. 2018).

> First, the Fourth Amendment requires that an arrest or detention that lasts for more than a short period of time must be justified by probable cause. Second, the police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based upon specific and articulable facts, the officer has a reasonable suspicion that criminal activity has or is about to occur. The third level of investigation occurs when a police officer makes a casual and brief inquiry of a citizen, which involves neither an arrest nor a stop. This third level is a consensual encounter in which the Fourth Amendment is not implicated.

*Id*. (citations omitted).

---

[8] Dahlin's first argument on appeal is that his status as a probationer did not justify the warrantless search. This argument appears to be a response to the trial court's ruling on his motion to suppress that "[t]he Conditions of Probation imposed upon [Dahlin] require him to submit to reasonable searches of his person or property to ensure compliance with the conditions of probation." Appellant's App. Vol. 2 at 49. The State made no such argument at the suppression hearing and has made no such argument on appeal, perhaps because, as Dahlin points out, his conditions of probation state, "I shall waive my fourth amendment right and allow reasonable search of my home, vehicle and/or person by my Probation Officer and/or law enforcement *with my Officer present.*" *Id*. at 110 (emphasis added). Obviously, Dahlin's probation officer was not present at the gas station when Officer Trueblood seized the handgun case from Dahlin's vehicle.

[19] The State does not argue that the officers had probable cause to arrest or detain Dahlin for more than a short period of time when Officer Trueblood removed the handgun case from Dahlin's vehicle, and Dahlin does not argue that the officers did not have reasonable suspicion to briefly detain him for investigatory purposes. *Cf. State v. Washington*, 898 N.E.2d 1200, 1205 (Ind. 2008) (holding that officer's "brief questioning" during traffic stop "as to whether the defendant had any weapons, drugs, or anything else that could harm the officer … was not prohibited by the Fourth Amendment."); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (holding that Fourth Amendment does not prohibit officer from asking driver to exit vehicle during traffic stop).[9] We therefore proceed from the premise that Dahlin was subjected to an investigative stop, which implicates the Fourth Amendment.

[20] Dahlin asserts that Officer Trueblood violated his Fourth Amendment rights by removing the handgun case from his car without a warrant and without a reasonable belief that he was armed and dangerous. Dahlin cites *Michigan v. Long*, in which the U.S. Supreme Court held that the Fourth Amendment permits an officer to conduct a warrantless search of the passenger compartment of a vehicle during a traffic stop, "limited to those areas in which a weapon may be placed or hidden," but only if the officer "possesses a reasonable belief based on 'specific and articulable facts which, taken together

---

[9] "A traffic stop is more akin to an investigative stop … than a custodial arrest." *Lockett v. State*, 747 N.E.2d 539, 541 (Ind. 2001).

with the rational inferences from those facts, reasonably warrant' the officer[] in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. 1032, 1050 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). *See also State v. Dodson*, 733 N.E.2d 968, 971 (Ind. Ct. App. 2000) ("When a vehicle has been properly stopped for investigative purposes, if the officer reasonably believes that he or others may be in danger, he may conduct a limited search of the automobile's interior for weapons without first obtaining a search warrant.") (citing, inter alia, *Long*).

But in this case, Officer Trueblood did not actually conduct a search of Dahlin's car; he saw the handgun case in open view on the front passenger's seat and seized it from the car. The open view doctrine, not to be confused with the plain view doctrine, "is used in situations in which a law enforcement officer sees contraband from an area that is not constitutionally protected, but rather is in a place where the officer is lawfully entitled to be." *Justice v. State*, 765 N.E.2d 161, 165 (Ind. Ct. App. 2002), *clarified on reh'g*, 767 N.E.2d 995.[10] "In such situations, anything that is within 'open view' may be observed without having to obtain a search warrant because making such 'open view'

---

[10] "The plain view doctrine is recognized as an exception to the search warrant requirement." *Justice*, 765 N.E.2d at 164. "The concept of 'plain view' is used when an officer is making a lawful search in a constitutionally protected area and discovers an item in plain view." *Id*. "Generally, items observed in plain view are not considered the product of the search." *Id*. at 165. "To justify a warrantless seizure under the plain view doctrine, a law enforcement officer must not have violated the Fourth Amendment in arriving at the place where items are in plain view, the 'incriminating character' of the items must be 'immediately apparent,' and the officer must have 'a lawful right of access' to the items in plain view." *Id*. (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990)). "If such requirements are met, the items discovered in 'plain view' may be seized without a warrant." *Id*.

observations do not constitute a search in the constitutional sense." *Id.* "Nonetheless, in order to lawfully seize items in 'open view,' it may be necessary to obtain a search warrant or be able to justify a warrantless seizure under an exception to the warrant requirement." *Id.*

[22] Citing *Lockett v. State*, 747 N.E.2d 539 (Ind. 2001), and *Delatorre v. State*, 903 N.E.2d 506 (Ind. Ct. App. 2009), *trans. denied*, the State claims that "[t]he safety of police officers is a legitimate and weighty justification for an intrusion." Appellee's Br. at 13. But those cases hold only that the Fourth Amendment does not prohibit an officer from asking whether a motorist has any weapons. Also, citing *Billingsley v. State*, 980 N.E.2d 402 (Ind. Ct. App. 2012), *trans. denied* (2013), the State asserts that "[i]n order to conduct a further investigation to determine whether Dahlin was intoxicated and whether he legally possessed the firearm, officers were permitted to freeze the situation by securing the firearm until it could be confirmed that Dahlin was entitled to possess it." Appellee's Br. at 12-13. But *Billingsley* holds only that the officer in that case did not convert an investigative stop into a custodial arrest by using his firearm to detain a suspect sitting in the passenger seat of an SUV in a parking lot, where the officer had a "specific and reasonable belief" that the suspect "may have been armed." 980 N.E.2d at 407.

[23] The State offers no other justification for the warrantless seizure of the handgun case. Nevertheless, the State correctly observes that "[a]ny error in the admission of evidence that is merely cumulative of other properly admitted evidence is harmless." Appellee's Br. at 15. *See Fuller v. State*, 674 N.E.2d 576,

578 (Ind. Ct. App. 1996) ("It is well recognized that any error in admitting evidence will be found harmless where the evidence is merely cumulative. This proposition also applies where the alleged error is of a constitutional nature.") (citation omitted). The State argues that any error in the admission of evidence regarding the handgun case and the handgun was harmless because "Dahlin did not object to the testimony of the officers that established there was a gun box in the car" and did not "object to the testimony of the officer that he admitted to having the gun in the car[.]" Appellee's Br. at 15.

[24]    Although Dahlin did in fact raise a continuing objection to such testimony, he cites no authority for the proposition that the testimony was inadmissible. The officers' personal observations regarding the publicly viewable contents of Dahlin's vehicle prior to the warrantless seizure of the handgun case could not be considered "fruit of the poisonous tree" for purposes of the exclusionary rule. *Cf. Clark v. State*, 994 N.E.2d 252, 267 (Ind. 2013) ("Generally speaking, evidence obtained pursuant to an unlawful seizure must be excluded under the fruit of the poisonous tree doctrine. This extension of the exclusionary rule bars evidence directly obtained by the illegal search or seizure as well as evidence derivatively gained as a result of information learned or leads obtained during that same search or seizure."). And Officer Gambrel's testimony that Dahlin told him there was a gun in the vehicle would not be excluded by the fruit of the poisonous tree doctrine or by the rule against hearsay. *See* Ind. Evidence Rules 802 (providing that hearsay is generally inadmissible) and 801(d)(2) (providing

that statement made by opposing party in an individual capacity and offered against that party is not hearsay).

[25] Moreover, a handgun need not be introduced into evidence to sustain a conviction for carrying a handgun without a license. *E.g.*, *Williams v. State*, 983 N.E.2d 661, 669 (Ind. Ct. App. 2013). Here, Officers Gambrel and Trueblood saw a handgun case on the front passenger seat of Dahlin's car, and Dahlin told Officer Gambrel that there was a gun in the car. The jury obviously disbelieved Dahlin's claims that he did not know there was a gun in the car until he began searching for his vehicle registration and that the gun belonged to his father, and this credibility determination did not hinge on the admission of the actual gun and gun case. The assessment of witness credibility "is the sole province of the jury." *Autrey v. State*, 700 N.E.2d 1140, 1142 (Ind. 1998). Under these circumstances, we conclude that any error in the admission of evidence regarding the handgun case and the handgun was harmless.[11]

## Section 2 – Dahlin's conviction is supported by sufficient evidence.

[26] Dahlin also argues that the evidence presented at trial is insufficient to support his conviction for carrying a handgun without a license. "When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither

---

[11] Dahlin does not argue that the officers' post-seizure activities unduly extended the length of the investigative stop, nor does he argue that evidence regarding his prior felony convictions should have been excluded for any reason.

reweigh evidence nor judge witness credibility." *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). "Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Ferrell v. State*, 746 N.E.2d 48, 50 (Ind. 2001). The evidence need not overcome every reasonable hypothesis of innocence. *Negash*, 113 N.E.3d at 1291. If the testimony believed by the trier of fact is sufficient to support the verdict, then we will not disturb it. *Ferrell*, 746 N.E.2d at 51.

[27]     Dahlin challenges the sufficiency of the evidence only as to whether he "carried" a handgun for purposes of Indiana Code Section 35-47-2-1; he concedes that he did not have a valid license to carry the handgun and that he had been convicted of a felony within fifteen years before the date of the offense. To convict a defendant of carrying a handgun in a vehicle, the State must prove that he had control over the vehicle, the unlicensed handgun was found in the vehicle, and the defendant had knowledge of the handgun's presence. *Henderson v. State*, 715 N.E.2d 833, 835 n.2 (Ind. 1999).[12] Knowledge

---

[12] Several cases state that, "[i]n addition, it must be established that there was an intention to convey or transport the weapon." *Cole v. State*, 69 N.E.3d 552, 560 (Ind. Ct. App. 2017) (quoting *Thurman v. State*, 793 N.E.2d 318, 320 (Ind. Ct. App. 2003) (citing *Klopfenstein v. State*, 439 N.E.2d 1181, 1184 (Ind. Ct. App. 1982)), *trans. denied*. In our view, evidence of a defendant's knowledge of the handgun's presence in the vehicle would be sufficient to establish that intent.

of a handgun's presence may be inferred where the defendant has exclusive possession of the premises on which it is found. *Negash*, 113 N.E.3d at 1291.

[28] Here, Dahlin had exclusive possession of the vehicle in which the handgun was found, and the handgun was in a case that was "[p]artially underneath" his backpack on the front passenger seat. Trial Tr. Vol. 1 at 105. This evidence is sufficient to support an inference that Dahlin had knowledge of the handgun's presence. Dahlin argues that his father had accidentally left the handgun in the vehicle, that he had borrowed the vehicle from his father, and that he did not know that the handgun was in the vehicle until he started looking for the vehicle registration. The State argues, and we agree, that this is "a clear request for this Court to reassess the credibility of the witnesses." Appellee's Br. at 18. This we may not do. Consequently, we affirm Dahlin's conviction.

[29] Affirmed.

Mathias, J., and Tavitas, J., concur.